John P. DECKER, Plaintiff-Appellant,

v.

MASSEY–FERGUSON, LIMITED, et al., Defendants-Appellees.

No. 245, Docket 81–7446.

United States Court of Appeals, Second Circuit.

Argued Nov. 16, 1981.

Decided June 3, 1982.

*they got into trouble."* *Id.* at 382 (emphasis added).

Sherrie R. Savett, Philadelphia, Pa. (Berger & Montague, P.C., Philadelphia, Pa., Greenfield & Chimicles, P.C., Bala-Cynwyd, Pa., and Kohn, Savett, Marion & Graf, P.C., Philadelphia, Pa., on the brief), for plaintiff-appellant.

David R. Hyde, New York City (Cahill Gordon & Reindel, Allen S. Joslyn and Charles A. Gilman, New York City, on the brief), and P. B. Konrad Knake, New York City (White & Case, Paul L. Kennedy and Daniel Rubock, New York City, on the brief), for defendants-appellees.

Before TIMBERS, VAN GRAAFEILAND and NEWMAN, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

This is an appeal from an order of the United States District Court for the Southern District of New York, 534 F.Supp. 873, Carter, J., dismissing plaintiff's amended complaint. Plaintiff John Decker alleges that in September 1976 he purchased 200 shares of the common stock of the defendant company, Massey-Ferguson, Ltd. (Massey). He instituted this action pursuant to section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5, promulgated thereunder, 17 C.F.R. § 240.10b–5, on behalf of all persons who purchased Massey common stock between February 1, 1976 and February 14, 1978.[1] The gravamen of his complaint was that the defendants disseminated false and misleading information about the Company and omitted material information from annual reports and SEC filings, thereby creating an inflated market price for the Company's common stock. Named as defendants with Massey were fourteen individuals, identified as directors and/or officers of the Company, and Clarkson, Gordon & Co., Massey's Canadian accountants.

The action was commenced in the Eastern District of Pennsylvania on February 9, 1979, and the parties stipulated that it might proceed as a class action. Before answering the complaint, all of the defendants moved to dismiss it for failure to plead fraud with the specificity required by Fed.R.Civ.P. 9(b) and for failure to state a claim upon which relief could be granted, Fed.R. Civ.P. 12(b)(6). Eleven of the individual defendants also moved under Rule 12(b)(2) to dismiss for lack of personal jurisdiction. Before these motions were decided, the action was transferred to the Southern District of New York.

On December 21, 1979, Judge Carter dismissed the complaint with leave to replead for failure to satisfy the requirements of Rule 9(b). The other motions were dismissed without prejudice as moot. Plaintiff's response to this order was the filing of the amended complaint which is before us on this appeal. On ·May 28, 1981, Judge Carter dismissed the amended complaint for failure to comply with Rule 9(b) and perforce to state claims upon which relief could be granted. *See Mooney v. Vitolo*, 435 F.2d 838, 839 (2d Cir. 1970); *Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 576 n.12 (2d Cir.1969). This appeal followed.

## I

Because many of plaintiff's allegations of wrongdoing center upon Massey's 1975 Annual Report which is in the record, we may properly refer to its contents. *Denton Construction Co. v. Missouri Portland Cement Co.*, 507 F.Supp. 53, 54 (E.D.Mo.1981) (citing 5 Wright & Miller, *Federal Practice and Procedure* § 1327, at 491 n.18 (1969)).[2]

---

1. Although plaintiff's amended complaint also contained claims under sections 18 and 20 of the Exchange Act, 15 U.S.C. §§ 78r and 78t, and the common law, these were dismissed by the district court, and plaintiff does not challenge that dismissal in this Court.

2. Because the parties stipulated that the action might proceed as a class action on behalf of all persons who purchased stock between February 1, 1976 and February 14, 1978, plaintiff was not limited in his allegations and proof to the allegedly wrongful statements that preceded

The Report shows that Massey, a Canadian corporation with its principal offices and headquarters in Toronto, is a holding company with over 100 subsidiaries scattered about the world. Through these subsidiaries and associated companies in which Massey holds minority interests, it manufactures farm machinery, industrial and construction machinery, and diesel engines. Its products are manufactured in thirty countries and sold in 190 countries. The Company's total assets at the end of 1975 were valued at $1,982M, and approximately 67% of them were located outside of North America. Its total sales for 1975 were $2,513M, approximately 70% of which were made outside of North America and 78% outside the United States. Between 1966 and 1975, the Company's total net sales had increased from $862M to $2,513M, and 44% of this increase, or $728M, occurred between 1974 and 1975. In 1974, Massey's net income was $68.4M; in 1975 it was $94.7M. These were not the kind of figures which ordinarily would cause company officials to wring their hands in despair.

However, the ensuing years have not been happy ones for the manufacturers of agricultural and construction equipment. Massey's common stock, which sold at more than $20 a share in 1975, is now selling for less than $3 a share. International Harvester, whose 1975 high was over $30, is now selling for less than $5. Deere & Co., the strongest of the three major manufacturers, which sold near $52 in 1975, is now around $30. Moreover, Deere recently has announced substantial employment and production cutbacks, cancellation of a stock purchase plan, and salary freezes. *See* Williams, *Even Deere Feels the Pinch*, N.Y. Times, May 6, 1982, at D1, Col. 2. This is the type of economic climate in which section 10(b) litigation flourishes.

## II

In *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 740, 95 S.Ct. 1917, 1927, 44 L.Ed.2d 539 (1975), Justice Rehnquist made the much quoted observation that a securities law "complaint which by objective standards may have very little chance of success at trial has a settlement value to the plaintiff out of any proportion to its prospect of success at trial so long as he may prevent the suit from being resolved against him by dismissal or summary judgment." Strike suits in this area, Justice Rehnquist continued, permit plaintiffs with groundless claims to abuse liberal federal discovery provisions, with the right to do so representing "in terrorem" increments in the settlement values of the alleged claims. *Id.* at 740–41, 95 S.Ct. at 1927–28.

■ Cognizant of the considerations thus expressed and of the irreparable damage to reputations and goodwill which results from charges of fraud, this Court has insisted that a complaint alleging fraudulent violations of section 10(b) and Rule 10b–5 satisfy the particularity requirement of Fed.R. Civ.P. 9(b). *Ross v. A. H. Robins Co.*, 607 F.2d 545, 557–59 (2d Cir. 1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980); *Denny v. Barber*, 576 F.2d 465, 468–69 (2d Cir. 1978); *Segal v. Gordon*, 467 F.2d 602, 606–08 (2d Cir. 1972). To pass muster in this Circuit a complaint "must allege with some specificity the acts constituting the fraud", *Rodman v. Grant Foundation*, 608 F.2d 64, 73 (2d Cir. 1979); conclusory allegations that defendant's conduct was fraudulent or deceptive are not enough. *Segal v. Gordon, supra*, 467 F.2d at 607.

In a prolix and discursive 69 page complaint, which is anything but the simple, direct, and concise statement mandated by Fed.R.Civ.P. 8(e), plaintiff's battery of lawyers seeks to charge Massey with liability for the losses sustained by class members who purchased Massey stock between 1976 and 1978. The complaint is an "everything but the kitchen sink" type of pleading which would give plaintiff's attorneys carte

his personal purchase of stock in September 1976. *See Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *Green v. Wolf Corp.*, 406 F.2d 291 (2d Cir. 1968), *cert. denied*, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969).

blanche in the area of liberal federal discovery. Because the "in terrorem" effect of such unfettered discovery would, to say the least, be substantial, it is important that the wheat in plaintiff's pleading be separated from the chaff.

■ We agree with the district court that many of the charges in plaintiff's complaint do not satisfy the requirements of Rule 9(b) and that others simply do not state actionable claims. Moreover, we find no abuse of discretion in the district court's refusal to give plaintiff's attorneys a third attempt to restate the defective allegations. *Denny v. Barber, supra,* 576 F.2d at 470–71. However, a Rule 12(b)(6) motion to dismiss need not be granted nor denied in toto but may be granted as to part of a complaint and denied as to the remainder. *Fielding v. Brebbia,* 399 F.2d 1003, 1006 (D.C.Cir.1968); *Drewett v. Aetna Casualty & Surety Co.,* 405 F.Supp. 877, 878 (W.D.La.1975); 12 Wright & Miller, *Federal Practice and Procedure* § 1358 (1969). Accordingly, although we affirm the district court's order in substantial part, we reverse as to the several claims which we find sufficiently well pleaded to withstand dismissal at this stage of the litigation.

## CLAIMS AGAINST MASSEY

■ It is well established by now that section 10(b) was not designed to regulate corporate mismanagement nor to prohibit conduct which does not involve manipulation or deception. *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 473, 479, 97 S.Ct. 1292, 1300, 1304, 51 L.Ed.2d 480 (1977); *Rodman v. Grant Foundation, supra,* 608 F.2d at 72–73. Plaintiff's complaint is in large measure an indictment of the management of a company which, like the industry in which it operates, has fallen on hard times. To state a claim under section 10(b), plaintiff must allege acts indicating an intent to deceive, manipulate, or defraud, *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 192 n.7, 96 S.Ct. 1375, 1380 n.7, 47 L.Ed.2d 668 (1976), and Rule 9(b) requires that the circumstances constituting such fraud be stated with particularity.

It is a serious matter to charge a person with fraud and hence no one is permitted to do so unless he is in a position and is willing to put himself on record as to what the alleged fraud consists of specifically.

1 Barron & Holtzoff, *Federal Practice and Procedure* § 302, at 215–16 (Wright Rev. 1960), *quoted in Segal v. Gordon, supra,* 467 F.2d at 607.

With regard to most of plaintiff's claims, we affirm Judge Carter's holding that this has not been done.

Plaintiff's complaint contains generalities and conclusions to the effect that Massey's reports presented a "false, misleading, and inflated picture of assets, earnings, and business." Such statements obviously do not comply with Rule 9(b). *Denny v. Barber, supra,* 576 F.2d at 469–70. Plaintiff's attempts to become more specific fare little better.

Massey's reports are replete with facts and figures whose accuracy has not been challenged. These figures demonstrate that, prior to 1976, Massey had achieved record growth, sales, and profits. Plaintiff's complaint alleges, nonetheless, that Massey's reports "falsely stated or implied that Massey had achieved record growth, sales, and profits." This allegation is not only conclusory, it is patently false.

Ignoring other irrefutable figures which show the amount of capital tied up in work in progress and inventories, plaintiff alleges a concealment of production and distribution mismanagement. He does this by quoting pertinent favorable narrative statements in Massey's reports and then alleging the contrary of each statement. Where Massey states that it has adopted advanced technology to solve distribution problems, plaintiff asserts that the company does not operate at the level of technological sophistication implied. Massey's claim of broad distribution strength is met by plaintiff's allegation that Massey's distribution system is unworkable. Massey's claim of effective coordination, planning, and control is countered with an allegation that the Company's

growth was "haphazard and uncoordinated, and unaccompanied by adequate operational, managerial and financial controls or return on investment." Generalized allegations such as these are completely inadequate. *Todd v. Oppenheimer & Co.*, 78 F.R.D. 415, 422–23 (S.D.N.Y.1978). There must be allegations of facts amounting to deception in one form or another. *Segal v. Gordon, supra*, 467 F.2d at 607.

Despite figures in Massey's financial statements which accurately portrayed the nature and extent of Massey's indebtedness, the Company, according to plaintiff, should have informed the world that it had overextended itself financially and that there was "substantial undercapitalization and excessive debt financing." Plaintiff asserts that Massey also should have concluded and publicly stated that its share of the North American market was declining because it spent less than its competitors on research, development, and market effort, delayed in marketing large-horsepower tractors, and "failed to market other products comparable to those manufactured by [its competitors]." Massey's capitalization and debt structure were fully disclosed in its consolidated financial reports. *See Associated Builders, Inc. v. Alabama Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974); *Spiegler v. Wills*, 60 F.R.D. 681, 683 (S.D.N.Y.1973). Massey's expenditures for marketing, engineering, and production development were also disclosed in its financial reports and could have been compared readily with those of its competitors. *Rodman v. Grant Foundation, supra*, 608 F.2d at 70; *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978). Massey stated in its 1975 Annual Report that there was a marketing trend toward large-horsepower tractors and that in 1976 it would announce new tractors to meet these changing requirements. The remaining allegation is simply conclusory rhetoric, not an "allegation of facts amounting to deception." *O'Neill v. Maytag*, 339 F.2d 764, 768 (2d Cir. 1964).

Without particularizing his claim with factual specifics, plaintiff asserts that Massey should have disclosed that its Hanomag division needed modernization and that con-

ditions at Massey's Des Moines plant were "chaotic"; also that Massey's disclosure of an "inadequate level of farm credit" in Brazil was not sufficiently evocative and disturbing. Rule 9(b) will have failed in its purpose if conclusory generalizations such as these will permit a plaintiff to set off on a long and expensive discovery process in the hope of uncovering some sort of wrongdoing or of obtaining a substantial settlement.

Plaintiff also alleges that Massey did not write down the value of certain functionally and economically obsolete manufacturing facilities, "including" three that plaintiff deigned to name. Plaintiff did not allege the figures at which any of the facilities were carried on Massey's books nor even the approximate figures at which they should have been carried. There is no allegation in the complaint that the book values of the properties in question could not be recovered through sale or use. In 1975, Massey's total depreciated fixed assets were in excess of $400M. It had developed a manufacturing base of fifty plants, containing 25M square feet and located in twelve countries. The complaint contains no factual allegations to demonstrate the materiality of the alleged overevaluation in the light of these overall figures. *See Jacobson v. Peat, Marwick, Mitchell & Co.*, 445 F.Supp. 518, 522 (S.D.N.Y.1977); *Gross v. Diversified Mortgage Investors*, 438 F.Supp. 190, 194 (S.D.N.Y.1977); *Rich v. Touche Ross & Co.*, 68 F.R.D. 243, 246 (S.D.N.Y.1975).

Despite a comprehensive discussion of Massey's pension plans in the footnotes of its consolidated financial statements, plaintiff alleges fraudulent concealment, undescribed inconsistencies in actuarial assumptions, and understatement of pension expenses "in an amount not yet determined." The information in the financial statements complied with then-existing SEC regulations, and plaintiff has alleged no particulars of fraudulent concealment.

Massey's disclosures of its competitive position also satisfied then-current SEC regulations. Information in Massey's 1975 An-

nual Report disclosed that it manufactured about 20% of all agricultural tractors, about 20% of all combined harvesters, and about 14% of all multicylinder diesel engines made in the Western World; that its market share of the Brazil farm machinery equipment market was approximately 50%, its share of the Argentine market 26%, and its share of the Mexican market 34%. The Report also stated that Massey expected to regain market leadership in the United Kingdom market, had increased its share of the German farm tractor market, and had experienced substantial improvements in market penetration in the Italian farm market. On the other hand, Massey was experiencing a "diminishing unit demand" in farm machinery in North America because of a trend to high-capacity, large-horsepower machines which Massey was not yet manufacturing, and the percentage of Massey's sales in the United States had been steadily declining from a high of 31% in 1966 to 22% in 1975.

In its filings with the SEC, Massey disclosed that it was the largest manufacturer in the Western World of agricultural tractors and sugar cane harvesters and believed that its aggregate agricultural equipment sales in the entire non-Communist world were exceeded only by two other United States companies. Massey disclosed that four manufacturers had larger sales of industrial tractors of the horsepower, range and type produced by Massey but that a number of manufacturers of heavier construction equipment had sales many times those of the Company. Massey also stated that it produced more high-speed diesel engines, world-wide, than any other manufacturer but that three manufacturers which produced heavier diesel engines than those produced by Massey had substantially greater revenues from world-wide sales.

During the period at issue herein, the detailed instructions for SEC filings now found in Regulation S–K, 17 C.F.R. § 229.-20, had not yet been promulgated. The then-current instructions for Form 10–K required merely that the registrant state the competitive conditions in its industry and its own competitive condition if known or reasonably available, with separate consideration given to its principal products or classes of products. There was no SEC requirement that Massey's competitive position be discussed in its Annual Report. Massey's disclosures substantially satisfied SEC requirements. The allegations that Massey fraudulently failed to disclose its competitive position do not state a valid claim.

At one point in the complaint plaintiff alleges that Massey failed to disclose in its Sept. 15, 1977 Quarterly Report for the nine months ending July 31, 1977 and a "press release of unknown date issued thereafter" that it had negotiated and agreed upon a debt placement that would substantially foreclose the payment of dividends in 1978. At another point, plaintiff alleges that a financing arranged in the "fall of 1977" restricted the payment of dividends. Massey's 1977 Annual Report disclosed that $150M of senior notes sold on Nov. 10, 1977 contained limitations on the payment of dividends. Fed.R.Civ.P. 9(f) provides that "[f]or the purpose of testing the sufficiency of a pleading, averments of time and place are material." Obviously, this is so as to the foregoing averments. Plaintiff's experienced lawyers cannot base charges of fraud on obfuscatory allegations such as these.

Finally, we see no actionable allegations of fraud with regard to Massey's 1975 "expectation" of higher sales, which expectation was specifically based on "forecasts of a higher level of housing starts as well as stimulative government programs [which] should permit an upturn for the construction machinery industry as 1976 progresses." "[E]conomic prognostication, though faulty, does not, without more, amount to fraud." *Polin v. Conductron Corp.*, 552 F.2d 797, 805 (8th Cir.), *cert. denied*, 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 129 (1977). It is the "more" that section 9(b) requires and that is lacking in plaintiff's complaint. We now know that the increased activity forecast for the construction industry did not take place. However, plaintiff has not alleged any particulars as to why Massey's

stated reliance on those forecasts was false or misleading.

Without belaboring the point any further, we agree in the main with the district court's holding that plaintiff's complaint fails to provide an adequate factual substantiation for its accusations and fails to concretize acceptably the alleged fraud. Our reaction to the complaint differs from that of the district court in only one respect. We believe that plaintiff's claim based upon the making of undisclosed, allegedly wrongful payments by a number of Massey's foreign subsidiaries was sufficient to get plaintiff by the pleading stage.

Even before the enactment of sections 103 and 104 of the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§ 78dd–1 and 78dd–2, the SEC had taken steps to discover and eliminate the undercover use of corporate funds to secure foreign business or business concessions. *See Report of the Securities and Exchange Commission on Questionable and Illegal Corporate Payments and Practices*, submitted to the Senate Committee on Banking, Housing and Urban Affairs, 94th Cong. 2d Sess. (1976) (SEC Rep.); *see also*, S.Rep.No. 114, 95th Cong. 1st Sess., *reprinted in* 1977 U.S.Code Cong. & Ad.News 4098, 4099. Although the Commission did not have the benefit of a general statutory prohibition against such payments, it felt that "questionable or illegal payments that are significant in amount or that, although not significant in amount, relate to a significant amount of business, are material and required to be disclosed." SEC Rep. at 14–15.

> The Commission is also of the view that questionable or illegal payments, if unknown to the board of directors, could be grounds for disclosure regardless of the size of the payment itself or its impact on dependent business because the fact that corporate officials have been willing to make repeated illegal payments without board knowledge and without proper accounting raises questions regarding improper exercise of corporate authority and may also be a circumstance relevant to the "quality of management" that should be disclosed to the shareholders. Moreover, even if expressly approved by the board of directors, a questionable or illegal payment could cause repercussions of an unknown nature which might extend far beyond the question of the significance either of the payment itself or the business directly dependent upon it. For example, public knowledge that a company is making such illegal payments, even of a minor nature, in one foreign country could cause not only expropriation of assets in that country but also a similar reaction or a discontinuation of material amounts of business in other countries as well.

SEC Rep. at 15.

In furtherance of its objective, the SEC instituted a so-called "voluntary disclosure program" which called upon those companies which suspected that illegal payments had been made to conduct an investigation under the auspices of persons not involved in the questionable activities. SEC Rep. at 6–13. In the spring of 1977, Massey conducted such an investigation, and, on December 22, 1977, it filed a Form 8–K Report with the SEC pursuant to sections 13 and 15(d) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78m and 78o(d).

This report disclosed, among other things, that, between 1973 and 1977, Massey had overbilled distributors in several foreign countries and remitted the overbilled amounts to the distributors, usually by payment to the distributors' accounts in other countries. Massey admitted that this subterfuge was accompanied by inaccurate documentation and that it may have assisted the distributors in violating local laws. The annual overbillings varied between $4.4M and $7.2M, the five year total exceeding $30M. Between 3.3% and 4.4% of Massey's annual sales during this period were affected by the overbilling.

Plaintiff's complaint alleges the making of these "illegal and improper" payments, which, it says, "rendered the affected sales and earnings from those countries vulnerable to termination if the illegal payments and/or methods of doing business were dis-

closed." Massey contends that the amount of the payments and the sales affected thereby were not material with the meaning of Rule 10b–5. *See Leasco Corp. v. Taussig,* 473 F.2d 777, 783 (2d Cir. 1972); *Lewis v. Valley,* 476 F.Supp. 62, 65–66 (S.D. N.Y.1979); *but see SEC v. Jos. Schlitz Brewing Co.,* 452 F.Supp. 824, 829–31 (E.D. Wis.1978). We believe, however, that such a determination cannot be made on the basis of the information now at hand. Among other things, the record fails to disclose which of Massey's subsidiaries or affiliates were involved, the extent of their individual involvement, and the relationship between that involvement and each company's individual sales. The record does not disclose the countries in which the alleged wrongdoing occurred nor which, if any, of their laws were in fact violated. The record does not identify the Massey employees or officers who made the alleged wrongful payments nor the individuals who benefited therefrom.

We need not decide now whether the issue of materiality can be resolved prior to disclosure of all these facts or whether fuller disclosure will permit disposition by summary judgment. We do hold, however, that more information is required than is presently before the Court. As to this claim, the complaint should have withstood Massey's motion to dismiss.

## COMPLAINT AGAINST THE DIRECTORS

■ Most of the defendant directors are non-residents of the United States, and most of them are outside directors. Their directorship, as such, imposed no duty on them to insure that all material adverse information about the corporation was conveyed to prospective purchasers of the Company's stock. *Lanza v. Drexel,* 479 F.2d 1277, 1289 (2d Cir. 1973) (en banc). An outside director's liability, if any, must be that of an "aider and abettor, a conspirator, or a substantial participant in fraud perpetrated by others." *Id.* However, conclusory allegations that defendants aided and abetted or conspired are not enough. *Segal*

*v. Gordon, supra,* 467 F.2d at 607–08. The complaint must charge a violation of section 10(b) by the Company, knowledge of such violation by the director, and his substantial assistance in the accomplishment of the violation, *IIT, an International Investment Trust v. Cornfeld,* 619 F.2d 909, 922 (2d Cir. 1980), or else the existence of an agreement between the director and one or more others to accomplish the wrongful purpose of violating section 10(b), *SEC v. Coffey,* 493 F.2d 1304, 1316 (6th Cir. 1974), *cert. denied,* 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975).

■ The Supreme Court has not yet decided whether reckless behavior will satisfy section 10(b)'s requirement of scienter, *i.e.* "a mental state embracing intent to deceive, manipulate, or defraud". *Aaron v. SEC,* 446 U.S. 680, 686 n.5, 100 S.Ct. 1945, 1950 n.5, 64 L.Ed.2d 611 (1980). There is some indication in this Circuit, however, that an aider and abettor's liability can be predicated upon recklessness only where the defendant owed a fiduciary duty to the plaintiff. *See, e.g., Edwards & Hanly v. Wells Fargo Securities Clearance Corp.,* 602 F.2d 478, 484–85 (2d Cir. 1979), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980). We need not resolve that issue in this case.

If plaintiff's attorneys have the "good ground" required of them by Fed.R.Civ.P. 11 to support a claim that any of Massey's directors was guilty of fraud arising out of the allegedly unlawful foreign payments, such good ground could be stated simply and concisely. Plaintiff need only allege the existence of facts and circumstances sufficient to warrant the pleaded conclusion that fraud had occurred. In so doing, plaintiff's attorneys would be stating "the circumstances constituting fraud . . . with particularity" as required by Rule 9(b).

Instead, as to most of the directors, the complaint contains only broad and conclusory allegations referable to the general charges of wrongdoing, such as that "the defendants and each of them knowingly, or with reckless disregard of the truth, concealed from plaintiff and the class the ma-

terial facts upon which this Amended Complaint is based and facts which would put plaintiff and the class on notice of such material facts and the claims set forth herein", or that "the defendants participated in, or knowingly or with reckless disregard for the truth lent material assistance to, and/or acquiesced in the foregoing acts and omissions and . . . played an active role in the preparation and dissemination of the false and misleading information and documents specified herein." These allegations are so broad and conclusory as to be meaningless. *Denny v. Barber, supra,* 576 F.2d at 469–70; *Shemtob v. Shearson, Hammill & Co.,* 448 F.2d 442, 444–45 (2d Cir. 1971); *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 94–97 (5th Cir. 1975).

Allegations that individual directors were in possession of all "material" facts with respect to the Company's operations and finances and personally knew or were recklessly indifferent to the fact that all the documents named in the complaint were false and misleading in all the respects referred to in the complaint likewise fail to furnish the required factual predicate for allegations of fraud and deception. *Id.; Segan v. Dreyfus Corp.,* 513 F.2d 695 (2d Cir. 1975); *Zerman v. Jacobs,* 510 F.Supp. 132, 134 (S.D.N.Y.1981).

Plaintiff's allegation that defendants Matthews, Staiger, Warren, and Thornbrough "knew, but did not make adequate or timely disclosure . . . that Massey had engaged in $31 million in illegal or improper payments" is a different matter. As to those defendants, the pleading on this charge is sufficient. *See Felton v. Walston & Co.,* 508 F.2d 577 (2d Cir. 1974).

### CLAIMS AGAINST CLARKSON, GORDON & CO.

■ In the SEC *Report on Questionable and Illegal Corporate Payments and Practices, supra,* the Commission stated that "virtually all questionable payment matters have involved the deliberate falsification of corporate books or records, or the maintenance of inaccurate or inadequate books and records which, among other things, pre-

vented these practices from coming to the attention of the company's auditors, outside directors and shareholders." *Id.* at 13. The Commission stated further that "[m]any of the instances of improper or illegal foreign payments examined by the Commission have involved cases in which inadequate or improper corporate books and records concealed the existence of these questionable payments from the independent auditors, as well as from some or all of the members of top management and the board of directors." *Id.* at 48.

As a result of these revelations, the Commission proposed the enactment of what is now 15 U.S.C. § 78m(b)(2), which, in substance, requires the keeping of accurate records and accounts. When records of a company's improper payments are hidden from its auditor, the auditor should not be held responsible because, as plaintiff puts it, the auditor lent its "imprimatur" to the company's financial statement.

Plaintiff's allegation that Clarkson, Gordon "reviewed or recklessly failed to review data and documents relating in part to . . . the adequacy of Massey's internal controls and accounting, particularly with respect to Massey's practice of overbilling and making improper or illegal payments to third parties", when properly parsed, contains no allegation of actionable fraudulent conduct. *Jacobson v. Peat, Marwick, Mitchell & Co., supra,* 445 F.Supp. at 523. Other generalized statements concerning Clarkson, Gordon's knowledge or reckless disregard of Massey's "untrue" statements of income or "wrongful activities" do not satisfy the requirements of Rule 9(b). Neither do allegations concerning the violation of generalized accounting principles requiring adequacy and fairness of disclosure, a conservative approach, complete financial information, and understandable methods of reporting.

■ Assuming for the argument that recklessness on the part of a non-fiduciary accountant will satisfy *Ernst & Ernst's* requirement of scienter, such recklessness must be conduct that is "highly unreasonable", representing "an extreme departure from the standards of ordinary care."

*Franke v. Midwestern Oklahoma Development Authority,* 428 F.Supp. 719, 725 (W.D. Okl.1976), *vacated on other grounds,* 619 F.2d 856 (10th Cir. 1980), *quoted with approval in Sanders v. John Nuveen & Co.,* 554 F.2d 790, 793 (7th Cir. 1977) and *Rolf v. Blyth Eastman Dillon & Co.,* 570 F.2d 38, 47 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). It must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company. *ITT, an International Investment Trust v. Cornfeld, supra,* 619 F.2d at 927. To satisfy Rule 9(b), plaintiff should have specified a factual basis for believing that Clarkson, Gordon was guilty of such conduct, *Gross v. Diversified Mortgage Investors, supra,* 438 F.Supp. at 195; conclusory allegations of fraudulent conduct are insufficient without specific allegations of fact. *Helfant v. Louisiana & Southern Life Insurance Co.,* 459 F.Supp. 720, 726–27 (E.D.N.Y.1978). Plaintiff's failure to state with particularity the circumstances constituting the alleged fraud warranted the district court in dismissing the complaint against Clarkson, Gordon.

## CONCLUSION

In the main, the complaint herein is a paradigmatic example of the type of pleading which concerned Justice Rehnquist in *Blue Chip Stamps v. Manor Drug Stores, supra,* 421 U.S. at 740–41, 95 S.Ct. at 1927–28, and which led to the enactment of Rule 9(b). Defendants should not be required to come with their witnesses from all over the world to defend the action, unless the district court and the defendants can perceive a "sufficient factual basis for plaintiff's claim to permit the action to proceed." *Gillman Bros. v. Peat, Marwick, Mitchell & Co.,* [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,512, at 93,995 (S.D.N.Y.1978).

We affirm the dismissal of all claims against Massey except the one that is based upon the making of allegedly wrongful foreign payments. We affirm the dismissal of all claims against Massey's directors except the claim that the defendants Matthews, Staiger, Warren, and Thornbrough knew about the unlawful undercover payments but did not make timely disclosure of them. We affirm the dismissal of all claims against the defendant Clarkson, Gordon & Co. The claims which are not affirmed are remanded to the district court for further proceedings. Costs of this appeal are awarded only to the defendant Clarkson, Gordon & Co.