**In re The WELLCARE MANAGEMENT GROUP, INC. SECURITIES LITIGATION.**

No. 1:96–CV–0521.

United States District Court, N.D. New York.

April 30, 1997.

Whiteman, Osterman Law Firm, Albany (Neil L. Levine, Leslie M. Apple, of counsel), Milberg, Weiss Law Firm, New York City (Steven G. Shulman, of counsel), for Plaintiff Ward and others similarly situated.

Bernstein, Litiwitz Law Firm, New York City (Max W. Berger, Bernstein, Litowitz, Berger & Grossman, L.L.P., of counsel), for Plaintiff Lewis Rosenberg and others similarly situated.

Pomerantz, Haudek Law Firm, New York City (Stanley M. Grossman, Pomerantz, Haudek, Block & Grossman, of counsel), for Plaintiff Baruch Singer and others similarly situated.

Cohen, Milstein Law Firm, Washington, DC (Lisa M. Mezzetti, Cohen, Milstein, Hausfeld & Toll, of counsel), for Plaintiff Bruce Murphy and others similarly situated.

Lowey, Dannenberg Law Firm, White Plains (Sherrie Brown, Lowey, Dannenberg, Bemporad & Selinger, P.C., of counsel), for Plaintiff Jonathan Wade and others similarly situated.

Barrack, Rodos Law Firm, Philadelphia, PA (Leonard Barrack, Daniel E. Bacine, of counsel), for Plaintiff Burton Weisfeld and others similarly situated.

Wechsler, Harwood Law Firm, New York City (Robert I. Harwood, Jeffrey M. Haber, of counsel), Garwin, Bronzaft Law Firm, New York City (Scott Fisher, of counsel), for Plaintiff Bernard Weber, Custodian for Daniela Weber Ugma and others similarly situated.

Epstein, Becker Law Firm, Washington, DC (Stuart M. Gerson, Epstein, Becker & Green, of counsel), Cohen, Dax Law Firm, Albany (Jeffrey C. Cohen, of counsel), for Defendant Wellcare.

Orans, Elsen & Lupert, New York City (Leslie A. Lupert, Orans, Elsen & Lupert, of counsel), for Defendant Ullman.

Shaw, Pittman Law Firm, Washington, DC (James T. Lenhart, Shaw, Pittman, Potts &

Trowbridge, of counsel), for Defendant Corsones.

Dreyer, Boyajian Law Firm, Albany (William J. Dreyer, of counsel), for Defendant Deloitte & Touche.

## MEMORANDUM–DECISION & ORDER

McAVOY, Chief Judge.

### I. BACKGROUND

Before the Court are two motions to dismiss the plaintiffs'[1] Amended Complaint pursuant to Fed.R.Civ.P. 9(b), Fed.R.Civ.P. 12(b)(6), and 15 U.S.C. § 78u–4,[2] brought separately by (1) the defendants WELLCARE MANAGEMENT GROUP, EDWARD A. ULLMAN, and MARYSTEPHANIE CORSONES, the respective former president and present chief financial officer of Wellcare (the "Wellcare defendants"), and (2) the defendant DELOITTE & TOUCHE, Wellcare's auditors for the 1993 and 1994 fiscal years.

It is the Wellcare defendants' position that the plaintiffs' Amended Complaint fails to plead scienter as required under § 10(b) of the Securities and Exchange Act of 1934. In addition, and assuming that the Court agrees with the Wellcare defendants' first position, the Wellcare defendants contends that the plaintiffs' § 20(e) claim, alleging controlling person liability, should be dismissed.

It is the defendant Deloitte & Touche's position that the plaintiffs have failed to allege a viable § 10(b) claim.

The Court now turns to the factual allegations made by the plaintiffs against each category of defendant.

### A. Wellcare Defendants

The class period is March 28, 1994 through May 14, 1996.

The defendant Wellcare is a managed health care holding company. Wellcare's revenue consisted largely of premiums earned by WCNY, a wholly owned subsidiary health maintenance organization. One of Wellcare's largest expenses was the medical expenses incurred by WCNY. These "medical expenses" include hospital charges, physician fees, and related health care costs, and estimates of benefit claims incurred but not yet reported. This case relates to alleged improper accounting and reporting activities by the defendants aimed at deceiving investors by artificially inflating reported revenues and deflating expenses.

The defendant Edward Ullman is Wellcare's founder, and served as Wellcare's Chairman, President, and Chief Executive Officer from its inception in 1983 until April 30, 1996. Ullman remained as a director and President of Wellcare until September 10, 1996, when he was replaced as President. Ullman signed each of the company's Form 10–K annual reports and Form 10–Q reports filed with the SEC during the class period.

Ullman was employed under a four-year agreement which provided for an annual bonus of 2% of Wellcare's uncapped pretax profits for 1994, and 2% of Wellcare's net profits up to a maximum of $200,000 per year thereafter. Ullman was also entitled to receive an additional bonus if so determined by the Board of Directors. Under Ullman's employment contract, he was entitled to receive options to purchase shares of Wellcare common stock on January 1 of each year during the term of his employment and stock appreciation rights that vested 25% each calendar year.

The defendant Marystephanie Corsones joined Wellcare, from Coopers & Lybrand, as Finance Director in July 1993, and since May 1994 has served as Wellcare's Chief Financial Officer and Vice President of Finance. Corsones has been a member of Wellcare's Board of Directors and Audit committee since November 1994. Corsones signed each of Wellcare's 10–K and 10–Q forms beginning in the second quarter of 1994.

The Amended Complaint alleges that the price of Wellcare stock was artificially inflated as a result of the Wellcare defendants' knowing or reckless conduct which caused Wellcare to report inflated revenues, lower

---

1. The instant case is a class action.

2. Governing private class action securities litigation.

medical expenses, and lower medical loss ratios for the years ended 1993–1995, all in violation of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934.

To sustain the price of its stock, Wellcare had to demonstrate that it was a growing company. This allegedly led to a series of actions by the Wellcare defendants designed to show higher earnings and reduced expenses.

The following transactions are alleged by the plaintiffs as the basis for their claims:

### Purchase of Mid–Hudson

Mid–Hudson Health Plan, Inc. ("Mid–Hudson") was a not-for-profit HMO that had been managed by Wellcare since it was established in 1984. The plaintiffs allege that Mid–Hudson was no more than a shell corporation, dependent on Wellcare for its existence. The alleged wrongdoing by the Wellcare defendants occurred in connection with the acquisition of Mid–Hudson.

When Wellcare acquired Mid–Hudson, it accounted for the acquisition as a purchase in Wellcare's year-end 1993 financial statements. The plaintiffs contend that Mid–Hudson was always a "special purpose entity," and as such, the acquisition should have been treated as a consolidation, thereby merging the financial statements for each entity. The ultimate result of treating the acquisition as a purchase rather than a consolidation was to inflate the net income of Wellcare from $2.830 million to $4.648 million, and earnings per share from $0.56 to $0.93. In addition, Wellcare recognized $6.549 million of "Goodwill," i.e., the difference between the purchase price of $2.44 million and Mid–Hudson's negative net worth of $4 million. Thus, Wellcare's assets and retained earnings were overstated by $4.109 million. The plaintiffs further allege that such accounting procedures do not comply with GAAP.

### 1994 Transactions

Again with the aim of showing increased net income and reduced expenses, the plaintiffs allege that Wellcare engaged in a series of improper transactions in 1994. In brief, on April 5, 1994, Ullman directed the payment by Catskill Medical of over $100,000 to doctors to whom Wellcare owed money, despite the fact that some of the debts predated the incorporation of Catskill Medical. On May 13, 1994, Wellcare received a $250,000 payment from Catskill Medical which was accounted for as a deficit payment, thereby reducing the amount of medical expenses incurred by Wellcare, despite the fact that there is no record of Catskill owing Wellcare such an amount. In late June 1994, 40 checks totaling $1,500,000 were received by Wellcare. However, the true source of these funds was two bank loans personally guaranteed by Ullman. In 1994, a total of $2.7 million was transmitted by companies such as Catskill Medical to Wellcare. Such funds were accounted for as deficits, but actually came from bank loans guaranteed by Ullman. The plaintiffs allege that medical expenses were understated by Wellcare in 1994 by $4.7 million, despite the fact that such expenses were actually rising.

### Sale of Wellcare Medical Management to PrimErgy, Inc.

The plaintiffs also allege that in 1995, in an effort to create the illusion of profitability, Wellcare sold Wellcare Medical Management, a wholly owned medical management subsidiary, to PrimErgy, Inc., for $570,000 cash and a note for $5.13 million. However, PrimErgy, Inc. allegedly was formed for the sole purpose of acquiring Wellcare Medical Management. In addition, just prior to the sale, Wellcare allegedly transferred $5.1 million to Wellcare Medical Management. The significance of this sale was to show the note as an asset on Wellcare's books, despite the dubious value of the note. Apparently, Wellcare Medical Management was virtually worthless absent the cash transfer from Wellcare. Wellcare even retained an option to repurchase Wellcare Medical Management in five years. Finally, it seems that Ullman personally guaranteed a $3 million line of credit to sustain the thinly capitalized PrimErgy shortly after the sale.

### Sale of Bienestar Trademark

Also in 1995, and in an effort to inflate revenue for that year, Wellcare recognized

$2 million in licensing fees from an overseas licensee without any payments having been made on the licensing agreement or any assurances that the licensee actually could pay the fees. The amount was later reduced when Wellcare revised its 1995 financial statements.

A March 16, 1996 *Barron's* article first publicized these transactions. The price of Wellcare stock immediately fell 12%. Within two weeks, despite an initial rebuttal to the article, Wellcare announced that it believed "a restatement will be required."

Wellcare then submitted a Form 12b–25 Notification of Late Filing with the SEC seeking two weeks additional time for the completion of an audit to permit further review and investigation as a result of the *Barron's* article. The two weeks became two months.

Ullman was removed as Chairman and Chief Executive Officer, NASDAQ notified Wellcare that it was delisting the company's common stock, effective May 13, 1996, and the price of Wellcare stock continued to fall.

On May 14, 1996, Wellcare restated its 1994 and 1995 financial statements. The results for 1994 were: earnings per share reduced by nearly 50%; medical loss ratio increased from 77.8% to 81.7%, which is alleged to be significant; and the company admitted that it improperly recorded as deficit payments $4.7 million in payments made from physician groups via bank loans guaranteed by Ullman.

The results for 1995 were: earnings per share reduced by over 75%; the company admitted that it had not received any fees from the sale of the Bienestar trademark; and the company stated that it would show a reserve for the $5.1 million note from the sale of Wellcare Medical Management by reason of its uncollectibility.

### B.  Defendant Deloitte & Touche

The plaintiffs also allege a § 10(b) claim against their auditors, Deloitte & Touche. The basis for this claim is alleged violations of generally accepted auditing standards ("GAAS"), and its allegedly reckless conduct in relation to the accounting of the 1994 transactions and the Mid–Hudson acquisition, described above. It is the contention of the plaintiffs that Deloitte & Touche was aware of facts that should have prompted it to conduct further investigation, and/or that Deloitte & Touche faced enough "red flags" to put it on notice of improper accounting practices by Wellcare. Deloitte & Touche claim that, at best, the plaintiffs have alleged a claim for negligence.

The Court now turns to the issues presented.

## II.  DISCUSSION

### A.  Standard for a Motion to Dismiss

On a dismissal motion for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the general rule is that the allegations in a plaintiff's Amended Complaint are deemed to be true and must be liberally construed in the light most favorable to the plaintiff. *Dahlberg v. Becker*, 748 F.2d 85, 88 (2d Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985). A Complaint should not be dismissed unless it appears beyond a reasonable doubt that the plaintiff cannot in any way establish a set of facts to sustain a claim which would permit relief *Hughes v. Rowe*, 449 U.S. 5, 10, 101 S.Ct. 173, 176, 66 L.Ed.2d 163 (1980); *Bass v. Jackson*, 790 F.2d 260, 262 (2d Cir. 1986).

When fraud is asserted, as in the instant case, the Court also must view the Amended Complaint in light of Fed.R.Civ.P. 9(b), which requires that "the circumstances constituting fraud ... be stated with particularity." Fed.R.Civ.P. 9(b). Securities fraud allegations are subject to the pleading requirements of Rule 9(b). *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993), *citing, Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989).[3] To serve the purposes of Rule 9(b), this Circuit requires, *inter alia*, that the plaintiffs allege facts that give rise

---

**3.** The elements of fraud are not contested. At issue is the sufficiency of the Complaint with    respect to scienter.

to a strong inference of fraudulent intent. *See Mills,* 12 F.3d at 1176. The requisite "strong inference" of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *See In re Time Warner Inc. Securities Litigation,* 9 F.3d 259, 268–69 (2d Cir.1993).

It is with these legal standards in mind that the Court turns to the issues presented.

## B. Sufficiency of Amended Complaint as to Scienter

The plaintiffs allege claims pursuant to Sections 10(b), or more specifically Rule 10b–5 of the regulations promulgated thereunder, and 20(a) of the Securities Exchange Act. 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b–5, & 15 U.S.C. § 78t(a). 17 C.F.R. § 10b–5 states, in relevant part:

> It shall be unlawful for any person, ... (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Section 78t(a) states:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Thus, to make out a claim for securities fraud, the plaintiffs must allege that "in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiffs' reliance on defendant's action caused [plaintiffs] injury." *Acito v. IMC-ERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir. 1995) (further citation omitted).

It is as to the sufficiency of the Amended Complaint with respect to scienter that the parties disagree in this case. The Court first notes that, after a review of the case law relating to this issue, the law relating to the sufficiency of a Complaint as to scienter is murky at best. Nevertheless, the Court has attempted to reconcile the relaxed pleading requirements of Fed.R.Civ.P. 9(b) with the more stringent standards of pleading adopted by this Circuit with respect to scienter under 10b–5.

As stated above, and in accordance with Fed.R.Civ.P. 9(b), scienter must be pleaded with sufficient particularity to "give rise to a strong inference of fraudulent intent." *Acito,* 47 F.3d at 53, *quoting, Time Warner,* 9 F.3d at 268 (further citation and internal quotation marks omitted). "Plaintiffs may plead scienter by alleging 'facts establishing a motive to commit fraud and an opportunity to do so,' or alleging 'facts constituting circumstantial evidence of either reckless or conscious misbehavior.'" *Id., quoting, Time Warner,* 9 F.3d at 268–69. The Court notes that although Rule 9(b) only requires that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally," this somewhat more relaxed pleading requirement "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990).

## 1. Defendants Wellcare, Ullman, and Corsones

The plaintiffs argue that their Amended Complaint sufficiently alleges, on the part of the defendants Wellcare, Ullman, and Corsones, facts establishing (1) that each defendant had the opportunity and motive to misstate Wellcare's financial status during 1993, 1994, and 1995, and (2) conscious or reckless behavior in relation to the alleged

638

fraudulent transactions. The defendants, of course, disagree.

As to the alleged opportunity and motive to misstate Wellcare's financial status during 1993, 1994, and 1995, the plaintiffs claim that the Amended Complaint sets forth sufficient facts to show that the defendants Ullman and Corsones had personal incentives to misstate Wellcare's financial condition in the form of incentive compensation plans tied to earnings, and that Ullman was the controlling shareholder of the corporation.

As to the allegations of conscious or reckless behavior, the plaintiff claim that the Amended Complaint sets forth (1) that the defendants prompted a series of "unusual transaction" in 1994 that improperly treated payments as assets rather than expenses on Wellcare's profit and loss statements, and understated Wellcare's liabilities to entities that made payments on Wellcare's behalf, (2) Ullman and Corsones executed a "purchase" of Mid–Hudson in 1993, and thereby created an asset on Wellcare's balance sheet when Mid–Hudson was actually a consolidated part of Wellcare all along, and thus, the alleged "purchase" should have been expensed in the 1994 Wellcare financial statements; (3) that the "sale" of Wellcare Medical Management to Primergy enabled Wellcare to recognize inflated income was undercapitalized for a number of reasons, including the recording of income from foreign licensing fees subsequently reversed as part of the restatement and the failure to establish certain reserve accounts.

The defendants claim that the plaintiffs' "allegations" are conclusory, rest on claims contained in a sensational *Barron's* article and on allegations of violations of GAAP and GAAS, misstate the true nature of certain transactions and the knowledge that the defendants had at the time the transactions occurred, and are insufficient to withstand a motion to dismiss under Second Circuit law. The Court will address these issues *seriatim.*

### i. Motive and Opportunity

In this Circuit, motive and opportunity are defined as the following: "Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportuni-

ty would entail the means and likely prospect of achieving concrete benefits by the means alleged." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130 (2d Cir.1994).

The Amended Complaint alleges that Ullman had a personal motive to commit the fraudulent acts alleged in that his employment contract with Wellcare provided for an annual bonus of 2% of Wellcare's uncapped pretax profits for 1994 and 2% of Wellcare's net profits up to a maximum of $200,000. In addition, it is alleged that Ullman was Wellcare's largest single shareholder, and thus, would benefit from an inflated stock price. Finally, Ullman was entitled to 15,000 shares of stock appreciation rights that vested 25% annually.

As to the defendant Corsones, the Amended Complaint alleges that she was entitled to an annual bonus of 1% of Wellcare's net profit up to $100,000, and thus, had a motive to defraud investors.

The Court first notes that this Circuit has held

allegation[s] that defendants were motivated to defraud [ ] because an inflated stock price would increase their compensation is without merit. If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions. '[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated.'

*Acito,* 47 F.3d at 54, *quoting, Ferber v. Travelers Corp.,* 785 F.Supp. 1101, 1107 (D.Conn. 1991) (further citation omitted); *see also, Shields,* 25 F.3d at 1130. In *Acito,* the Circuit held insufficient allegations that "defendant officers of [a company] were motivated to inflate the value of [that company's] stock because the increase in stock price [would have] a direct effect on their executive compensation." 47 F.3d at 53. Even the sale of a certain quantum of stock during the relevant time period is not, in all cases, sufficient to withstand a motion to dismiss. *See* 47 F.3d at 54 (sale by outside director of 11% of his holdings in subject company did not give

rise to a "strong inference" of intent to deceive).

In cases where courts have found a strong inference of an intent to deceive on the basis of motive, the defendant generally has had to have actually realized a benefit, not merely had the potential for a benefit. *See, e.g., Turkish v. Kasenetz,* 27 F.3d 23, 24 (2d Cir.1994) (defendants' fraudulent representations and concealed material facts induced sale of 25% interest in family business to an estate); *Cohen v. Koenig,* 25 F.3d 1168, 1174 (2d Cir.1994) (motive alleged when Complaint stated that buyers intentionally misstated assets of corporation to obtain different terms and close sale); *Goldman v. Belden,* 754 F.2d 1059, 1070 (2d Cir.1985) (motive alleged by setting forth facts that two individual defendants profited from defendants' bullish statements by selling significant amounts of stock held in defendant corporation). In the instant case, the Amended Complaint fails to allege expressly that any benefit was realized. However, the Amended Complaint does allege that each individual defendant was entitled to an annual bonus tied to some measure of profit for the preceding year. Thus, the clear implication of those employment terms is that the individual at issue received a benefit, in the form of an increased bonus, as a result of fraudulently inflating profits. As stated above, the Court cannot sustain the plaintiffs' claims on the basis of motive if scienter rests solely on the fact that individual defendants stood to benefit by way of employment incentives. However, if scienter is supported by more than just that Ullman and Corsones stood to receive larger bonuses if profits were fraudulently increased, the Court will not disregard, as irrelevant, allegations that incentive compensation was affected by the alleged fraudulent conduct.

There is no question that the Amended Complaint sufficiently alleges that the defendants had an opportunity to commit fraud. As stated in the Amended Complaint, the individual defendants were the president and chief financial officer of Wellcare. Ullman signed each 10–K statement, was familiar with the financial condition of Wellcare, and allegedly orchestrated each fraudulent transaction. Corsones was ultimately responsible for the creation of the financial statements themselves. As an experienced financial officer and accountant, Corsones should have known, according to the Amended Complaint, that Wellcare was engaged in fraud. The alleged misstatements generally relate to the amount of medical expense for a given year, revenue, and other component of the financial statements for Wellcare. Thus, it is clear to the Court that the Amended Complaint states sufficient facts to show opportunity to commit fraud. *See, e.g., Chill v. General Elec. Co.,* 101 F.3d 263, 267 (2d Cir.1996), *citing, San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 813 (2nd Cir.1996) (indisputable that key directors and officers have ability to manipulate their company's stock price); *In re Time Warner,* 9 F.3d at 269 (same).

Ullman and Corsones allegedly profited from the artificially inflated stock price of Wellcare, and were in position that enabled them to effectuate that result. Thus, on the basis of the forgoing discussion, the defendants' Ullman and Corsones motion to dismiss should be denied.

### ii. Conscious or Reckless Behavior

Having found that the Complaint sufficiently alleges motive and opportunity, the Court need not discuss whether the Complaint sufficiently alleges facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *See Time Warner,* 9 F.3d at 268–69. However, the Court will briefly state the reasons why it considers the Amended Complaint sufficient as to this alternative basis for pleading scienter.

Although the Second Circuit has maintained that recklessness is a form of scienter in "appropriate circumstances," *Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 46 (2d Cir.1978), "mere garden variety breach of a known duty does not constitute such recklessness." *Gross v. Damon Corp.,* 1995 WL 138612, at *3 (S.D.N.Y.). "Reckless conduct is, at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care.'" *Rolf,* 570 F.2d at

47; *In re Fischbach Corp. Securities Litigation,* 1992 WL 8715, at *5 (S.D.N.Y.) (finding appropriate circumstances for recklessness as a form of scienter when there is "wilful blindness"). In other words, the defendants' conduct must be so grossly negligent that it raises a strong inference of intent. *Time Warner,* 9 F.3d at 268.

The Amended Complaint alleges that the defendants Ullman and Corsones had knowledge of, condoned, and/or encouraged (1) the deliberate overstatement of earnings by a number of means, (2) demands for checks from medical practices whose doctors were not contracted with Wellcare, (3) the demand for and receipt of checks from doctors allegedly for nonexistent deficits, (4) the misstatement of assets such as "other receivables-net," (5) the improper treatment of the "acquisition" of Mid–Hudson, and (6) the failure to take a reserve in connection with the foreign licensing of the "Bienestar" trademark. Assuming, as the Court must, that the allegations relating to these actions is true, the Court finds that the plaintiffs have alleged facts tending to show negligence that is tantamount to intent. *See In re Leslie Fay Companies Inc.,* 871 F.Supp. 686, 698 (S.D.N.Y.1995), *modified on other grounds,* 918 F.Supp. 749 (1996).

For the reasons stated herein, the Court finds that the plaintiffs have pleaded scienter sufficiently to withstand the defendant's Ullman and Corsones motion to dismiss.

## C. Motion to Dismiss Controlling Persons Claim

■ To establish a claim under § 20(a), a plaintiff must allege (1) a primary violation, (2) scienter, and (3) control of the primary violator by the defendant. *Robbins v. Moore Medical Corp.,* 788 F.Supp. 179, 188 (S.D.N.Y.1992) (further citation omitted). The defendants' motion is premised entirely on the assumption that the plaintiffs' 10(b) claim would fail for failure to properly plead scienter. The Court has determined that the plaintiffs have pleaded scienter. Accordingly, the defendants' motion to dismiss the plaintiffs' § 20(a) claim, which creates liability for controlling persons, must be denied.

## D. Defendant Deloitte & Touche

■ The Second Circuit has repeatedly held that for § 10(b) violations, an allegation of recklessness is sufficient. *See, e.g., Sirota v. Solitron Devices Inc.,* 673 F.2d 566, 575 (2d Cir.1982); *IIT v. Cornfeld,* 619 F.2d 909, 923 (2d Cir.1980); *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1305 (2d Cir.1973) (en banc). However, the Second Circuit has characterized recklessness in this context as "at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Rolf v. Blyth Eastman Dillon & Co.,* 570 F.2d at 47, *quoting, Sanders v. John Nuveen & Co.,* 554 F.2d 790, 793 (7th Cir.1977). The Circuit later explained, "[i]t must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company." *Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 120 (2d Cir.1982) (citation omitted). It is with these standards in mind that the Court turns to the motion brought by defendant Deloitte & Touche.

The plaintiffs make a number of allegations in support of their claims against Deloitte & Touche. First, the Amended Complaint alleges a number of violations of generally accepted auditing standards ("GAAS"). However, it is well settled that alleging that an auditor violated GAAS is insufficient, standing alone, to withstand a motion to dismiss. *See In re Frank B. Hall & Co., Inc., Sec. Litig.,* 693 F.Supp. 1460, 1466 (S.D.N.Y.1988). Second, the plaintiffs allege that, with respect to the Mid–Hudson "acquisition" Deloitte & Touche had knowledge of Mid–Hudson's thin capitalization, and the fact that it existed solely for the benefit of and because of the support of Wellcare. Third, the plaintiffs allege that Deloitte & Touche had knowledge with respect to the improper reporting of the $2.7 million received through bank loans personally guaranteed by Ullman and used to reduce Wellcare's medical expense in 1994. Each of these improperly recorded transactions showed Wellcare to have earned an inflated income amount for

the years in which they occurred, and thereby improved Wellcare's attractiveness in the market. Finally, the plaintiffs alleged that there were a number of "red flags" raised before Deloitte & Touche during its audits that should have caused the firm to investigate further, or at a minimum question its opinion. *See, generally, In re Leslie Fay*, 871 F.Supp. at 699 ("while [the defendant's] ignorance of warning signs might in one sense demonstrate it was merely negligent, allegations that, with gross recklessness, [the defendant] ignored multiple 'red flags' could reasonably support an inference that [the defendant] acted with intent.").

As to each of these transactions, Deloitte & Touche claims that the Amended Complaint fails to allege that Deloitte & Touche attempted to hide or conceal any relevant facts. In addition, Deloitte & Touche claims that the Amended Complaint fails to allege that it manipulated or deceived anything or anyone as required by § 10(b). Deloitte & Touche point out that the Amended Complaint concedes that it publicly disclosed all pertinent information in Deloitte & Touche's audit opinion. In fact, Deloitte & Touche claim that all of the detail in the Amended Complaint about how different the Mid–Hudson transaction would have looked under a consolidation, as compared to a purchase, came from documents publicly disseminated after the 1993 audit it performed. As to the alleged improper reporting with respect to the $2.7 million in loans, Deloitte & Touche claim that no more than the failure to investigate deeply enough, i.e., negligence, is alleged. Again, no information was withheld, explained away, or concealed by Deloitte & Touche.

The Court first reiterates that in this case's present posture, the Court must accept as true all allegations in the Amended Complaint, and draw all reasonable inferences in favor of the plaintiffs. *See In Re Leslie Fay*, 871 F.Supp. at 698. Also, the Court must remain mindful that the plaintiffs are asserting a § 10(b) claim. Section 10(b), codified at 15 U.S.C. § 78j(b), states

§ 78j. Manipulative and deceptive devices

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Moreover, the Exchange Act has been amended to include the following language:

(2) Required state of mind

. . .

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2) (emphasis added). Thus, in addition to the legal standards set forth previously herein, the Court must consider whether the allegations in the Amended Complaint fit within the meaning of the statute. In other words, has the Amended Complaint not only set forth facts strongly tending to show recklessness, highly suggestive of intent, but do those facts reveal manipulation or deception on the part of Deloitte & Touche? The answer is one not easily determined.

It is clear that the Amended Complaint alleges that the defendant auditor violated industry standards. In addition, the Amended Complaint alleges that Deloitte & Touche knew or should have been aware of certain actions by Wellcare that would have in the long run decreased the reported income for 1993 and 1994, and thereby decreased the stock price per share. It is also clear from the Amended Complaint that no specific information was hidden from the public by Deloitte & Touche. In fact, Deloitte &

Touche stated in publicly disseminated documents the effect of considering the Mid–Hudson "acquisition" as a consolidation rather than a purchase. In addition, Deloitte & Touche claims, and the plaintiffs do not dispute, that it had no knowledge that the $2.7 million in payments received from doctors originated with bank loans personally guaranteed by Ullman. When it learned all the facts relating to those payments, it made a restatement.

After considering the allegations in the Amended Complaint, the Court concludes that the plaintiffs have failed to make out a viable § 10(b) claim against Deloitte & Touche. At best, the plaintiffs have alleged violations of GAAS and negligence. This is insufficient as a matter of law. *See Decker*, 681 F.2d at 120. The plaintiffs contend that the facts in *Decker* were very different from the instant case. It is the plaintiffs' contention that the Complaint in *Decker* contained only conclusory allegations. However, the Court takes a different view. In *Decker*, the Court found that the plaintiff had alleged violations of GAAP, failure to review certain documents, and reckless disregard for facts known to the defendant. Although it is true that the *Decker* Court held that the plaintiff's Amended Complaint failed to satisfy Fed. R.Civ.P. 9(b), by failing to allege recklessness with the requisite particularity, the Court also stated that, assuming that recklessness had been alleged, there were insufficient facts to show that the defendant's conduct would "approximate an actual intent to aid in the fraud being perpetrated by the audited company." *Decker*, 681 F.2d at 121.

Although there may be more specific factual allegations in the instant Amended Complaint, the Court finds that the plaintiffs have failed to allege facts that would approximate actual intent to manipulate or deceive. The facts alleged do not raise a strong inference of recklessness, as that term has been defined in Circuit precedent. See 15 U.S.C. § 78u–4(b)(2); *Decker*, 681 F.2d at 120; *In Re Leslie Fay*, 835 F.Supp. at 174–175. For example, unlike *Leslie Fay*, in the instant

case, there are no facts to suggest that Deloitte & Touche turned a blind eye. This is particularly true in light of the fact that the consolidation treatment of Mid–Hudson was fully disclosed, and that Deloitte & Touche conducted further investigation and issued a restatement after learning about the personal loan guarantees by Ullman. Accordingly, the plaintiffs' claims as against the defendant Deloitte & Touche should be dismissed.[4]

### III.  CONCLUSION

For the reasons stated herein, the motion to dismiss the Amended Complaint brought by the defendants Ullman and Corsones is hereby DENIED, and the motion to dismiss the Amended Complaint brought by the defendant Deloitte & Touche is hereby GRANTED, and the Court hereby ORDERS that the claims asserted against the defendant Deloitte & Touche be dismissed, with prejudice.

IT IS SO ORDERED.

---

4. The Court need not reach the issue of whether the Amended Complaint sufficiently pleads that the work performed by Deloitte & Touche was "in connection with the purchase or sale of any security" as required under § 10(b).