**AIG GLOBAL SECURITIES LENDING CORP., as lending agent for certain affiliated lenders, AIG Life Insurance Company, Allstate Life Insurance Company, Bank Leumi USA, Bayerische Landesbank, New York Branch, First Floridian Automobile and Home Insurance Company, First Trenton Indemnity Company, Halifax PLC, International Finance Corporation, the Premier Insurance Company of Massachusetts, Safeco Life Insurance Company, Societe Generale, as manager for Certain Funding Limited, the Travelers Indemnity Company and the Travelers Insurance Company, Plaintiffs**

v.

**BANC OF AMERICA SECURITIES LLC, and First Union Securities, Inc. Defendants.**

**No. 01 CIV. 11448(JGK).**

United States District Court, S.D. New York.

March 31, 2003.

David Spears, Lucinda O McConathy, Richards, Spears, Kibbe & Orbe, New York, NY, for AIG Global Lending Corp., AIG Life Ins. Co., Allstate Life Ins. Co., Bank Leumi USA, Bayerische Landesbank, New York Branch, First Floridian Auto. and Home Ins. Co., First Trenton Indem. Co., Halifax PLC, Intern. Finance Co., The Premier Ins. Co. of Massachusetts, Safeco Life Ins. Co., Societe Generale, Certain Funding Ltd., The Travelers Indem. Co., The Travelers Ins. Co.

Warren H. Colodner, Kirkpatrick & Lockhart, New York, NY, for Banc of America Securities, LLC.

## OPINION AND ORDER

KOELTL, District Judge.

This is an action charging securities fraud. The plaintiffs purchased securities in two private offerings of asset-backed securities. The securities were backed by consumer installment contracts entered into by The Heilig–Meyers Furniture Company ("Heilig–Meyers"), a speciality retailer of home furnishings that earned substantial revenues by selling furniture through fixed-term, fixed-payment installment sales contracts. After Heilig–Meyers declared bankruptcy, the plaintiffs in this action sued the two firms from which they purchased the securities and alleged, among other things, securities fraud. The defendants have now moved to dismiss the Complaint.

The plaintiffs are AIG Global Securities Lending Corporation ("AIG"); AIG Life Insurance Company ("AIG Life"); Allstate Life Insurance Company ("Allstate Life"); Banc Leumi USA ("Banc Leumi"); Bayerische LandesBank, New York Branch ("Bayerische LandesBank"); First Floridian Automobile and Home Insurance Company ("First Floridian"); First Trenton Indemnity Company ("First Trenton"); Halifax PLC ("Halifax"); International Finance Company ("IFC"); The Premier Insurance Company of Massachusetts ("Premier"); SAFECO Life Insurance Company ("SAFECO Life"); Societe Generale; The Travelers Indemnity Company ("Travelers Indemnity"); and The Travelers Insurance Company ("Travelers Insurance"),(collectively the "plaintiffs"). The defendants are Banc of America Securities, LLC ("Banc of America") and First Union Securities, Inc. ("First Union") (collectively the "defen-

dants"). The plaintiffs have alleged claims under both the federal securities laws and the New York State common law, arising out of the allegedly false and misleading statements and omissions made in Offering Memoranda and other documents that were used to promote, market and sell the securities to the plaintiffs. The plaintiffs assert four causes of action: (1) violations of § 10b of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (Count 1); (2) violations of § 12(a)(2) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77*l*(a)(2) (Count 2); (3) common law fraud and deceit (Count 3); and (4) negligent misrepresentation (Count 4).[1]

The defendants now move to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(6) and Fed.R. Civ. P. 9(b) arguing, that with respect to the claim under § 10(b) and Rule 10b–5, the plaintiffs have failed to plead fraud with specificity as required by Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). The defendants also argue that the § 12(a)(2) claims must be dismissed because § 12(a)(2) applies only to public, not private, offerings. Finally, the defendants argue that the plaintiffs' common law claims must also be dismissed for failure to allege fraud with particularity.

### I.

On a motion to dismiss, the allegations in the Complaint are accepted as true. *See Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir.1998). In deciding a motion to dismiss, all reasonable infer-

---

1. A related case, *Northwestern Mutual Life Ins. Co. v. Banc of America,* No. 02 Civ. 3788, —— F.Supp.2d ——, is also before this Court and raises claims arising out the same Rule 144A private offering against Banc of Amer-

ica, First Union, and Goldman, Sachs & Co., and is based on violations of Wisconsin state law. Today the Court has also issued an Opinion and Order resolving the defendants' motions to dismiss in that case.

ences are drawn in the plaintiff's favor. *See Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir.1995); *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985). Therefore, the defendants' motion to dismiss should only be granted if it appears that the plaintiffs can prove no set of facts in support of their claim that would entitle them to relief. *See Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Grandon*, 147 F.3d at 188; *Goldman*, 754 F.2d at 1065.

In deciding the motion, the Court may consider documents that are referenced in the Complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002); *see also Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991); *VTech Holdings Ltd. v. Lucent Techs., Inc.*, 172 F.Supp.2d 435, 437 (S.D.N.Y.2001). "[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it relies and which is integral to the complaint, the court may nonetheless take the document into consideration in deciding the defendant[s'] motion to dismiss, without converting the proceeding to one for summary judgment." *Int'l Audiotext Network, Inc. v. AT & T Co.*, 62 F.3d 69, 72 (2d Cir.1995) (internal citation and quotation marks omitted); *see Yucyco, Ltd. v. Republic of Slovenia*, 984 F.Supp. 209, 215 (S.D.N.Y.1997). Accordingly, the following

facts alleged in the Complaint are accepted as true for the purposes of this motion.

Heilig–Meyers, one of the nation's largest publicly held speciality retailers of home furnishings, has its corporate headquarters in Richmond, Virginia. (Compl.¶ 20.) As of June 30, 1997, Heilig Meyers operated approximately 1,295 retail stores in 38 states, the District of Columbia and Puerto Rico. (*Id.*) Two years later, as of June 30, 1998, prior to its Chapter 11 Bankruptcy filing, it operated 873 stores in 29 states, the District of Columbia and Puerto Rico. (*Id.*)

An important part of Heilig–Meyers' operating strategy depended on the use of installment sales, whereby it offered extended payment terms on most merchandise purchased under fixed-term, fixed-payment installment sales contracts (the "Contracts"). (Compl.¶ 21.) These Contracts provided for the payment by the obligor of finance charges plus a specific total amount of payments equal to the amount financed, and those amounts were payable in substantially equal monthly installments. (*Id.*) Each contract was secured by the merchandise purchased from the store. (*Id.*) These Contracts constituted a substantial portion of Heilig–Meyers' sales. (*Id.*) As of December 31, 1997 the aggregate amount owed under these Contracts was $957,741,000, of which $876,148,000 was from principal, while $81,593,000 was from unearned finance charges. (Compl.¶ 23.)

In February, 1997 the Heilig–Meyers Master Trust (the "Trust") was formed in order to hold a substantial number of these installment sales Contracts and also in order to issue multiple series of asset backed securities. (Compl.¶ 22.) The Contracts which the Trust held originated and were held at various Heilig–Meyers stores. (Compl.¶ 23.) The Trust was formed pursuant to a Master Pooling and

Servicing Agreement, dated February 26, 1997, and named the MacSaver Funding Corporation as transferor, Heilig–Meyers as servicer, and First Union National Bank, an affiliate of First Union, as trustee. (Compl.¶¶ 25, 29.) The transferor was responsible for transferring and assigning the installment sales Contracts to the Trust. (Compl.¶ 27.) The servicer was responsible for all aspects of servicing and administering the Contracts, a task that included billing obligors, collecting payments due under the Contracts, communicating with obligors, investigating and following up on payment delinquencies and defaults, conducting late-stage collections on delinquent and defaulted accounts, and maintaining internal records and databases. (Compl.¶ 28.) The trustee was responsible for preserving the Trust and its assets. (Compl.¶ 29.) The trustee's responsibilities included monitoring the servicer and serving as a "backup servicer" that would stand ready and able to ensure a smooth transition to a new servicer should the existing servicer cease to perform its duties. (Id.)

The Trust issued three series of asset backed securities ("the Certificates") during 1997 and 1998. (Compl.¶ 30.) Each Certificate represents an undivided interest in the Trust, and conferred on a Certificate holder the right to receive, as payments of interest and principal on the Certificates, a portion of the collections on the Contracts, in accordance with the terms and conditions contained in the Pooling and Servicing Agreement and other documents. (Compl.¶ 30.)

When the Trust issued Certificates, they were first purchased by First Union and Banc of America, and those companies served as underwriters, meaning they purchased the securities for the purpose of promoting, marketing, offering and selling them to investors, including the plaintiffs. (Compl.¶ 1.) The basis of this lawsuit is the alleged fraud committed by First Union and Banc of America in their role as underwriters of the Heilig–Meyers asset backed securities. (Id.)

In February, 1997 the Trust issued a series of securities called the Variable Funding Certificates, Series 1997–1 ("Series 1997–1 Certificates"). (Compl.¶ 31.) There were two classes of Series 1997–1 Certificates, Class A–1 and Class A–2, which were purchased for an aggregate original principal amount of $592,000,000. (Id.) First Union purchased all of the Class A–1 Certificates, while Banc of America purchased all of the Class A–2 Certificates. (Id.) At the time of the Trust's two subsequent offerings, which took place in 1998, Banc of America and First Union continued to hold the Series 1997–1 Certificates, and with the proceeds that they eventually received from the 1998 offerings, First Union and Banc of America repaid a significant amount of the principal they had invested in purchasing the Series 1997–1 Certificates. (Id.)

In February 1998 the Trust issued another series of certificates ("Series 1998–1 Certificates") that were divided into four classes of interests, namely (1) Class A 6.125% Asset Backed Certificates, in the aggregate principal amount of $307,000,000; (2) Class B 6.35% Asset Backed Certificates, in the aggregate principal amount of $61,000,000; (3) an interest referred to as the collateral indebtedness interest, having an initial principal balance of $32,000,000; and (4) Class D Asset Backed Certificates, in the original principal amount of $35,000,000. (Compl.¶ 32.) The defendants purchased all of the 1998–1 Class A and Class B Certificates and resold those Certificates to qualified institutional investors, including the plaintiffs, as part of the 1998–1 Offering ("1998–1 Offering") which began on February 20, 1998. (Compl.¶ 33.)

The defendants, First Union and the Banc of America, served as the underwriters of the 1998–1 Offering, which sold the Class A and Class B 1998–1 Certificates, and in connection with that offering, drafted a formal Offering Memorandum (the "1998–1 Offering Memorandum"). (Compl.¶ 36.) In addition, the defendants also prepared summary charts and memoranda containing information about the Offering, the Certificates, the Trust, the Pooling and Servicing Agreement, Heilig–Meyers and the Contracts. (Compl.¶ 37.) This information, together with information in telephone conferences, was provided to the plaintiffs in connection with the 1998–1 Offering. (*Id.*)

In August, 1998 the Trust issued another series of certificates ("Series 1998–2 Certificates") that were also divided into four classes of interests, namely (1) Class A Floating Rate Asset Backed Certificates, in the aggregate original principal amount of $230,000,000; (2) Class B Floating Rate Asset Backed Certificates, in the aggregate original principal amount of $50,000,000; (3) an interest referred to as the collateral indebtedness interest, having a principal balance of $31,300,000, and (4) Class D Asset Backed Certificates, in the aggregate original principal amount of $27,055,000. (Compl.¶ 39.) As with the 1998–1 Offering, the defendants purchased all of the Class A and Class B Series 1998–2 Certificates and resold them in an offering (the "1998–2 Offering") starting on August 20, 1998 to qualified institutional investors, including the plaintiffs. (Compl.¶ 40.)

The defendants served as the underwriters of the 1998–2 Offering, which sold the Class A and Class B 1998–2 Certificates, and in connection with that offering, drafted a formal Offering Memorandum (the "1998–2 Offering Memorandum"). (Compl.¶ 43.) In addition, the defendants also prepared summary charts and memoranda containing information about the Offering, the Certificates, the Trust, the Pooling and Servicing Agreement, Heilig–Meyers and the Contracts. (Compl.¶ 44.) This information, together with information in telephone conversations, was provided to the plaintiffs in connection with the 1998–2 Offering. (*Id.*)

The various plaintiffs purchased Certificates from one or both of the defendants in connection with one or both of the 1998–1 and 1998–2 Offerings. (Compl.¶¶ 46–60.)

In early August 2000, Banc of America sought to reassure the Class A and B Certificate holders about the condition of their investments should Heilig–Meyers file for bankruptcy. (Compl. ¶ 62.) The reassurances included statements that represented that in the event of a bankruptcy, First Union Bank, as trustee, was a "warm" back-up servicer, willing and able to assume the role of servicer should Heilig–Meyers cease to perform that function. (*Id.*) On August 2, 2000 Bank of America issued a public report indicating that even if Heilig–Meyers were to file for bankruptcy, the Class A and Class B Certificates would be paid down after 13 months, a figure based on the then current rate of collection of the Contracts. (Compl.¶ 63.) The report also asserted that the collection history of the Trust had been sound and stable and that the 1998–1 and 1998–2 Offerings had been structured so as to withstand a significant deterioration in the monthly collection rate. (*Id.*)

On or about August 10, 2000, Heilig–Meyers informed the trustee that Heilig–Meyers intended to stop performing its role as servicer during the week of August 14, 2000. (Compl.¶ 64.) On August 14, 2000, First Union Bank, the trustee, successfully enjoined, for a period of three days, Heilig–Meyers from abdicating its role as servicer. (Compl.¶ 65.)

On August 16, 2000, Heilig–Meyers filed a petition for Bankruptcy under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia. (Compl.¶ 66.) At that time, Heilig–Meyers filed a motion in the Bankruptcy Court for authority to abandon its obligations as servicer and to reject the Master Pooling and Servicing Agreement. (*Id.*) Heilig–Meyers also announced its intention to close several hundred retail stores, including stores through which it collected payments on the Contracts. (*Id.*) In explaining its bankruptcy, according to some analysts, Heilig–Meyers cited a high level of delinquencies on payments under the Contracts and high collection costs for those Contracts as a drag on its profitability. (Compl.¶ 67.)

On August 18, 2000, First Union Bank filed a complaint in the Bankruptcy Court in order to prevent Heilig–Meyers from repudiating its servicing duties or from terminating the employment of personnel responsible for servicing and collections. (Compl.¶ 68.) In this filing, First Union Bank indicated that making collections on the Contracts was difficult, due in part to the decentralized collection system then in place, and it concluded that "[i]t is not possible to replicate [Heilig–Meyers'] far-flung collection system on short notice." (*Id.*) After the filing of the Complaint in this case, Heilig–Meyers and First Union Bank indicated that the dispute had been settled, with Heilig–Meyers agreeing to employ certain staff at stores to receive and process payments for 60 days and to deliver its computer data and the underlying Contracts to First Union Bank. (Compl.¶ 69.)

Banc of America issued a public report on August 18, 2000, indicating that Heilig–Meyers planned to close 302 stores in 30 to 60 days. (Compl.¶ 71.) The report also stated that 264 stores were part of the Trust and they amounted to 38% of the stores in the Trust. (*Id.*) The report also stated that Heilig–Meyers would no longer extend credit through installment sales contracts and that the company intended to outsource all future credit operations. (*Id.*) Banc of America indicated that the performance of the pool of receivables in the Trust had been "steady" and "in line with general expectations," and that the default rate had averaged 7–8% over the prior 6 to 12 months. (Compl.¶ 72.)

After its bankruptcy filing on August 16, 2000, Heilig–Meyers ceased to send bills to obligors under the Contracts and did not function as an effective servicer of the Trust. (Compl.¶ 74.) Thereafter, First Union Bank failed to assume in any meaningful way the role and responsibilities of servicer. (*Id.*) Collections on the Contracts plummeted during August and September 2000. (*Id.*) Although beginning in October 2000, First Union Bank hired one or more third parties to take on the responsibilities of the servicer, the collections on the Contracts have not recovered. (Compl.¶ 75.) These third parties have indicated that Heilig–Meyers' records and data relating to the Contracts are in disarray and are missing large amounts of critical information necessary to enable adequate servicing and collections to be accomplished. (*Id.*) The holders of the 1998–1 and 1998–2 Class A and Class B certificates are likely to lose much or all of their current investment. (Compl.¶ 76.)

After Heilig–Meyers declared bankruptcy, the plaintiffs filed the present lawsuit, based on various alleged misrepresentations and omissions made in connection with the 1998–1 and 1998–2 Offerings and that were made in the preliminary and final Offering Memoranda, summary memoranda and charts provided to investors and in oral statements made by the defen-

dants in conference calls and other conversations with investors. (Compl.¶¶ 79–80.)

The alleged misrepresentations and omissions concern several broad categories of facts and circumstances relating to the practices of Heilig–Meyers, the nature of the securities being sold in the two offerings, and duties to be performed by the defendants in case of a Heilig–Meyers bankruptcy. First, the plaintiffs allege that the defendants represented that Heilig–Meyers had in place reasonable and effective procedures and practices for servicing, billing and collections under the Contracts, when in reality the collections system of Heilig–Meyers was decentralized, the company lacked the means to monitor compliance of collections by individual stores, and Heilig–Meyers did not have adequate records to monitor delinquent and defaulted accounts. (*See* Compl. ¶¶ 82–95.) Second, the defendants represented that the Trust's trustee, originally First Union Bank, was ready and able to serve as servicer or would facilitate a transition to a new servicer should Heilig–Meyers cease to perform that role. These representations were made, although the defendants allegedly knew that First Union Bank had inadequate plans and capabilities to serve as a back-up servicer, and although there were other relevant circumstances that would make the transition to a new servicer more difficult. The plaintiffs allege that the defendants never disclosed that these circumstances would likely disrupt the income streams from the Contracts. (*See* Compl. ¶¶ 96–114.) Third, the defendants represented that the Contracts had a favorable record of losses and delinquencies that were comparable to the rates of other large retailers. The plaintiffs allege that the defendants failed to acknowledge that the stated loss and delinquency rates were artificially buoyed by certain non-standard practices and liberal non-mainstream accounting methods. (*See* Compl. ¶¶ 115–24.)

Fourth, the plaintiffs claim that the defendants materially overstated the aggregate principal balances due under the Contracts, while simultaneously materially understating the amount of unearned finance charges. (*See* Compl. ¶¶ 125–31.) Fifth, the defendants allegedly failed to disclose the potential that certain circumstances would permit holders of collateral indebtedness Certificates to have priority in receiving payments over the Class A and Class B Certificate holders. (*See* Compl. ¶¶ 132–63.) Sixth, according to the plaintiffs, the defendants failed to disclose adequately their financial self-interest in both the 1998–1 and 1998–2 Offerings, namely that the proceeds of these offerings would be used to repay the defendants' investment in the 1997–1 offerings. (*See* Compl. ¶¶ 164–170.) Finally, the plaintiffs allege that the defendants represented that the Class A and Class B Certificates were conservative investments, notwithstanding the fact that the defendants had knowledge concerning the numerous problems with Heilig–Meyers. The plaintiffs allege that the disclosure of that information would have resulted in a different risk evaluation. (Compl.¶¶ 171–74.)

The defendants now move to dismiss the plaintiffs' claims, arguing, among other things, that the plaintiffs have failed to plead fraud with particularity with respect to any of the alleged misrepresentations, as required by Fed.R.Civ.P. 9(b) and the PSLRA.

## II.

Fed.R.Civ.P. 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed R. Civ. P. 9(b); *see Four Finger Art Factory v. Dinicola,* No. 99 Civ. 1259 (JGK), 2001 WL 21248, at *5 (S.D.N.Y. Jan.9, 2001). To meet the requirements of Rule 9(b), a

complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993).

■ The PSLRA also requires that allegations of securities fraud based on misrepresentations or omissions of material facts be made with particularity. The PSLRA provides, in relevant part,

> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1). A complaint alleging violations of § 10(b) and Rule 10b–5 must, therefore, also satisfy the PLSRA's pleading requirements. *See Novak v. Kasaks*, 216 F.3d 300, 306–07 (2d Cir.2000).[2]

### A.

■ In their first set of allegations, the plaintiffs allege that the defendants made various misrepresentations regarding Heilig–Meyers' methods of servicing and collecting payments under the Contracts. (Compl.¶¶ 82–95.) In three paragraphs of the Complaint, the plaintiffs have specifically identified the representations that they contend were fraudulent. (*See* Compl. 85, 88, 89). These paragraphs recite, in significant detail, the means that Heilig–Meyers used to collect the amounts due under the Contracts and how the company kept records on the obligors' history of payments. (*See, e.g.*, Compl. ¶ 85(b) ("Heilig–Meyers' collection procedures included extensive telephone contact and written notices to past due obligors, and monitoring of all Contracts on a daily, weekly, and monthly basis through a series of automated reports."); Compl. ¶ 88(a)(iii) ("[C]ollection efforts for late-stage delinquencies and defaulted accounts were centralized."); Compl. ¶ 89(a)(ii) ("Heilig–Meyers used an "old-fashioned" approach to credit that was very thorough and involved extensive verification of information.").) The plaintiffs recite over thirty representations that the defendants made regarding various details and facets of the collections and servicing of the Contracts. (*See* Compl. ¶¶ 85, 88, 89.)

Although these paragraphs satisfy some of the pleading requirements of Rule 9(b), the plaintiffs have failed to allege, in any specific sense, why these representations were in fact fraudulent. There are no specific facts pleaded that suggest that the representations, as alleged in paragraphs

---

2. The plaintiffs, in their papers and at oral argument, argued that the Complaint should not be dismissed under Rule 9(b) if the Complaint, taken as a whole, creates an inference of fraud. This, however, is not a fair statement of the legal standard under Rule 9(b). The cases cited by the plaintiffs, including *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576 (2d Cir.1990), do not stand for the proposition that if the Complaint alleges that the "overall impression" conveyed by the defendants was misleading, dismissal is improper under Rule 9(b). The Court of Appeals has made clear that specific factual allegations must exist in a Complaint, and that these specific statements or omissions are to be individually analyzed in order to determine whether the plaintiff has pleaded fraud with particularity. *See, e.g., San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir.1996) (conducting Rule 9(b) analysis with respect to "statements at issue"); *Andrew H.W. Olsen v. Pratt & Whitney Aircraft*, 136 F.3d 273, 275 (2d Cir.1998) (dismissing complaint where "allegations of fraud [were] conclusory and lacking in particulars"). Moreover, all of the cases cited by the plaintiff for this proposition were decided before the passage of the PSLRA, which requires that individual statements be identified and fraud be pleaded with particularity.

85, 88, and 89, were indeed false or misleading. All the plaintiffs have done is to allege in broad terms that Heilig–Meyers had no centralized billing system, no reasonable means of monitoring compliance, and no reasonable means of monitoring the collection performance or billing practices of individual stores. (Compl. ¶ 91; *see also* Compl. ¶ 92–93 (alleging that the Heilig–Meyers lacked state of art collection facilities and its operations were in fact decentralized).) But the fact that Heilig–Meyers may not have had reasonable means of monitoring compliance with its policies or that their collections were more decentralized than the plaintiffs had originally thought does not explain why the specific representations regarding the Heilig–Meyers collections practices were false or misleading. The general conclusory allegations about the collection policies fail to specify which of over thirty policies the plaintiffs have identified were not actually followed or were inadequate.

Moreover, the plaintiffs' allegations with respect to collection of Contracts are insufficient to allege false or misleading statements, in light of the significant disclosures made by the defendants regarding the billing and collection practices of Heilig–Meyers. For example, the Offering Memoranda for both the 1998–1 and 1998–2 Offerings indicated that each Heilig–Meyers store had a credit manager who was individually responsible for extending credit and collecting on the obligations due under Contracts issued by that particular store. (*See* 1998–1 Offering Memorandum dated February 20, 1998 ("1998–1 Offering Memorandum") attached as exh. B to Decl. of Jeffrey Livingston dated March 4, 2002 ("Livingston decl.") at 33 ("Each Heilig–Meyers Store has a credit manager who . . . is responsible for extending and collecting that store's installment sale contracts in accordance with corporate guidelines."); 1998–2 Offering Memorandum dated August 20, 1998 ("1998–2 Offering

Memorandum") attached as exh. C to Livingston Decl. at 32 (same).) The Offering Memoranda also made clear that collections were made at individual stores, rather than at a centralized facility, and that most customers made payments at individual stores rather than by mail. (1998–1 Offering Memorandum at 33–34 ("[Heilig–Meyers] encourages obligors to make payments in the store . . . This strategy has been successful, with a majority of customers at the Heilig–Meyers Stores making monthly payments at the store rather than by mail."); 1998–2 Offering Memorandum at 33 (same).) The Offering Memoranda do not state that the collection procedures are carried out centrally but rather that the Contracts are transferred to a central credit center from the retail store when Heilig–Meyers is notified that the obligor has declared bankruptcy. (1998–1 Offering Memorandum at 33; 1998–2 Offering Memorandum at 33.) Finally, the Memoranda indicate that the collection process involved nearly 300 regional bank accounts. (1998–1 Offering Memorandum at 34; 1998–2 Offering Memorandum at 34.) These disclosures, at a minimum, suggest the existence of a substantially decentralized credit and collection system, where the majority of credit decisions were made in each store by a local credit manager and where local stores were primarily responsible for collections. The plaintiffs have alleged that the disclosures made by the defendants as to collection practices were false and misleading because they did not reveal the absence of a centralized billing and collections system. However, in light of the disclosures in the Offering Memoranda, the representations regarding the collections and billing practices of Heilig–Meyers simply could not support the allegation of false statements. *Cf. Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 115–16 (2d Cir.1982) (finding plaintiff's statement

that its product distribution system was "technologically sophisticated," when in fact distribution was "unworkable" and conditions at one plant were "chaotic", was not kind of statement that amounted to deception or fraud).

### B.

█ In their second set of allegations, the plaintiffs have claimed that the defendants misrepresented First Union Bank's ability and intention to serve as a back-up servicer in the case that Heilig–Meyers was no longer able to act as servicer. The plaintiffs allege that the defendants made misrepresentations and omissions with respect to the "role, ability and preparedness of First Union Bank with respect to servicing." (Compl.¶ 110.) Although the plaintiffs describe in detail the need and importance of having a backup servicer for asset backed securities and the difficulties encountered when Heilig–Meyers declared bankruptcy, (Compl.¶¶ 96–114), they identified only two specific statements or representations that could be the basis of a securities fraud claim. The plaintiffs first allege that the Offering Memoranda represented that if the servicer failed to perform its role "all rights and obligations" would pass to the trustee, First Union Bank. (Compl.¶ 101.) Second, the plaintiffs allege that the Backup Servicing Agreement provided that First Union Bank would smooth the transition to a new servicer by, among other things, maintaining information about the Contracts for the new servicer. (Compl.¶ 108.) Beyond these two statements, the plaintiffs only allege in the most general terms that the defendants made misrepresentations and omissions in the Offering Memoranda, written materials, and conversations regarding the back-up servicer problem.

(*See, e.g.,* Compl. ¶ 109.) These kinds of vague, conclusory allegations that do not indicate what the specific representations were or who made them do not satisfy the requirements of Fed.R.Civ.P. 9(b). *See, e.g., Decker,* 681 F.2d at 116 ("Generalized allegations ... are completely inadequate ... There must be allegations of fact amounting to deception in one form or another.") (citations omitted).[3]

With respect to the two specific statements identified by the plaintiffs, those statements also fail to satisfy the requirements of Rule 9(b). Primarily, there is no explanation as to why the statement in the Offering Memoranda, that the "rights and obligations" would pass to the trustee, was false or misleading. The plaintiffs have not specifically alleged why the obligations did not in fact pass to First Union Bank, or what those obligations were, or how they were not performed by First Union Bank. Moreover, given the disclosures that were made in the Offering Memoranda, this statement about the "rights and obligations" could not give rise to a sustainable allegation of deception. The Offering Memoranda make clear that First Union Bank, in light of a servicing failure by Heilig–Meyers, would not immediately take over the role of servicer, but would, among other things, attempt to seek bids from other possible servicers, and thus, First Union Bank was not the immediate back-up servicer. (1998–1 Offering Memorandum at 60; 1998–2 Offering Memorandum at 58–59.)

█ With respect to the statement in the Backup Servicer agreement that First Union Bank would "maintain current information on the Contracts ... [so] as to facilitate a rapid transition," the plaintiffs have not alleged how that statement was

---

**3.** The plaintiffs' assertion that the defendants failed to disclose risks concerning servicing also fails to satisfy Rule 9(b), because there is no specific risk or problem alleged to have been in the defendants' knowledge that was not disclosed. (*See* Compl. ¶ 107.)

fraudulent. Although the plaintiffs have alleged that First Union Bank did not perform those duties, (Compl.¶ 111.), that only indicates that the contractual provisions entered into by First Union Bank may not have been performed. There are no facts alleged that the terms of the Backup Servicer Agreement were not accurately conveyed to the plaintiffs or that when First Union Bank entered into that agreement, it did not intend to perform its obligations. As the Court of Appeals has explained, "The failure to carry out a promise made in connection with a securities transaction is normally a breach of contract. It does not constitute fraud unless, when the promise was made, the defendant secretly knew that he could not perform." *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir.1993). There are no facts alleged to show that First Union Bank did not intend to abide by the Backup Servicing Agreement or that the plaintiffs in conveying that information were conveying a false representation. Alleging that First Union Bank failed to abide by its expressed contractual commitment is insufficient to satisfy Rule 9(b)'s requirement that the plaintiffs allege why the representations were fraudulent. *See id.; see also Anatian v. Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85, 88 (2d Cir.1999) (affirming district court's holding that defendant's failure to abide by loan commitment obligations was a breach of contract, not securities fraud, and that plaintiffs failed to allege how the alleged statements were fraudulent).

### C.

■ The plaintiffs' third set of allegations claim that the defendants misrepresented Heilig–Meyers' rates of loss and delinquency under the Contracts. The Complaint alleges that the defendants indicated that the Contracts controlled by the Trust had very favorable loss and delinquency rates, and that these rates were lower than those of other successful retailers. (Compl.¶¶ 115–120.) Those statements were allegedly false and misleading, because Heilig–Meyers used certain unorthodox and non-standard practices, used "recency accounting" to decrease artificially their delinquency rates, and failed to disclose that their comparison figures did not account for the fact that Heilig–Meyers calculated losses differently from the method used by other retailers. (Compl.¶ 121.)

These statements do not satisfy Rule 9(b). Although the plaintiffs have claimed in conclusory terms that the loss figures were materially false, they have provided no indication of the amount by which the figures were supposedly under or overstated.[4]

The plaintiffs also have shown no correspondence between the allegedly non-orthodox accounting practices and the specific representations identified as being misleading. Identifying a broad class of accounting deficiencies does not suffice to satisfy Rule 9(b), if there is no attempt made to link the use of those practices with the particular statements made by the defendants.

Moreover, given the disclosures in the Offering Memoranda, the plaintiffs have failed to allege facts from which it could be said that the actual statements in the Offering Memoranda are false and misleading. The Offering Memoranda disclosed the fact that Heilig–Meyers extended credit by providing flexible-terms to customers. (*See* 1998–1 Offering Memoranda at 34 ("The Company has a flexible policy of

---

**4.** Indeed, at oral argument it became clear that the plaintiffs did not even allege that the figures themselves were incorrect, but rather that the comparison to the figures for other retailers was misleading. (Tr. dated Dec. 13, 2002 at 58–60.)

working with certain delinquent customers to, among other things, adjust payment schedules, a practice which ... reduces default rates."); 1998–2 Offering Memoranda at 32 (same).) The Memoranda also disclosed that recency accounting was being used by Heilig–Meyers, by indicating that an account would be delinquent, or "charged-off", only if 180 days has elapsed from the date of the last payment. Consequently, no delinquency would exist if a payment had been received within the last 180 days, notwithstanding the fact that all amounts previously due had not been paid. (*See* 1998–1 Offering Memoranda at 34, 35 n. 2; 1998–2 Offering Memoranda at 34, 34 n. 2.) These statements indicate that Heilig–Meyers had disclosed the accounting practices and procedures used to arrive at the loan and delinquency figures it disclosed. In light of these disclosures, Heilig–Meyers indicated the means by which its delinquency rates were calculated.

To the extent that the plaintiffs allege that the numbers were misleading because other retailers may have used different calculations or accounting practices, the plaintiffs fail to point to any statements that purport to represent that all retailers used the same accounting methods to measure delinquencies or that the accounting measures used by Heilig–Meyers, while allegedly "non-standard," (Compl.¶ 121(a)), were not acceptable accounting standards. Indeed, even if the plaintiffs had alleged that the measures used by Heilig–Meyers failed to comply with Generally Accepted Accounting Principles ("GAAP"), such a statement would be insufficient to comply with Rule 9(b), since there would be no basis to conclude that the practices actually used were fraudulent. *See, e.g., Decker,* 681 F.2d at 120–21; *In re Ultrafem Inc. Sec. Litig.,* 91 F.Supp.2d 678, 702 (S.D.N.Y.2000).

### D.

The plaintiffs allege that the defendants, in the 1998–1 and 1998–2 Offering Memoranda, materially misrepresented the aggregate total amount owed under the Contracts, as well as the principal balances and unearned finance charges due, and that they knew or were reckless in not knowing that the quoted amounts for the amounts owed as of December 31, 1997 and June 30, 1998 were materially overstated and that the unearned finance charges were materially understated or that the Trust had materially inadequate facilities or means for accounting for its assets. (Compl.¶¶ 125–27.) The Complaint subsequently makes it clear that the basis for this conclusion is that after Heilig–Meyers went into bankruptcy in August 2000, the difference in balances reported by Heilig–Meyers in September 2000 and by a third party for October 2000 was "too large" to be explained other than by concluding "that Heilig–Meyers' prior reporting was false or that the Trust had materially inadequate facilities or means for accounting for its assets." (Compl.¶ 131.)

These statements fail to satisfy the requirement of Rule 9(b) and the PSLRA that the plaintiffs specify why the statements are misleading. The statements in the Complaint are wholly conclusory and fail to explain how the Contract balances were overstated. Indeed, the Complaint asserts, in the alternative, that the Trust may have had inadequate facilities to account for its assets. Moreover, the plaintiffs have failed to explain what third party report they are relying on and how large the reported differences were. Indeed, reliance on a third party report issued two months after the Heilig–Meyers bankruptcy undercuts any assertion that it could be a basis to judge the material truthfulness of accounts balances years before Heilig–

Meyers declared bankruptcy, and constitutes inactionable fraud by hindsight. *See, e.g., San Leandro,* 75 F.3d at 812–13 (2d Cir.1996); *Denny v. Barber,* 576 F.2d 465, 469–70 (2d Cir.1978). In addition, conclusory allegations of deficient contract balances are insufficient. *See, e.g., Decker,* 681 F.2d at 116; *In re Health Mgmt. Sys. Inc. Sec. Litig.,* No. 97 Civ. 1865 (HB), 1998 WL 283286, at *5 (S.D.N.Y. June 1, 1998) (finding that conclusory allegation that defendants overstated earnings insufficient to state fraud claim).

### E.

■ In a series of lengthy paragraphs, the plaintiffs contend that the defendants did not disclose the fact that they had an agreement that established that under certain circumstances holders of the collateral indebtedness interests (the "Class C interests") would have priority over the Class A and Class B Certificate holders in receiving payments due under the Contracts. (Compl.¶¶ 132–63.) The plaintiffs term the circumstances that would allow such priority to flow to the Class C interests "non-reduction events" and claim that the existence of these "non-reduction event" provisions were not disclosed by the defendants. (Compl.¶¶ 134–136.) They also allege that the Class C interests have now asserted in litigation that Class C interests should have priority, and consequently the plaintiffs, as Class A and B Certificate holders, are at risk of losing their priority. (Compl.¶¶ 137–40.) In addition, the plaintiffs claim that the defendants represented in the offering materials that Class A and B certificates would retain priority for Contract payments over the other classes of interests created by the 1998–1 and 1998–2 Offerings. (Compl.¶¶ 144–158.)

These allegations do not satisfy Rule 9(b) because there is no allegation that creates the necessary inference that when the defendants made the various statements indicating that the Class C Certificates were to be subordinate to the Class A and Class B Certificates that these statements were false. All that the plaintiffs have done is to identify statements regarding subordination, but have not pleaded that those statements, when made, were false and misleading statements. Indeed, the plaintiffs indicate that they have hired counsel to resist the claims of the Class C interest asserted against them in another litigation. The plaintiffs cannot assert that the statements by the defendants were false and misleading when they are consistent with the plaintiffs' position as to the true nature of the relationship between the Class C interests and the plaintiffs' interest.

### F.

The plaintiffs contend that the defendants failed to disclose the fact that the proceeds they received from the 1998–1 and 1998–2 Offerings would be used to pay off their investments in the 1997–1 Certificates, which they had not resold and continued to hold. (Compl.¶¶ 164–170.) Given the disclosures made by the defendants in the Offering Memoranda regarding their intentions with respect to the 1997–1 Certificates, the statements cannot be found to be materially false or misleading.

The defendants disclosed that proceeds of the two 1998 offerings would be used to repay the 1997–1 Series in its entirety. The 1998–1 Offering Memorandum states, in no uncertain terms, under the bolded heading "USE OF PROCEEDS" that "[t]he net proceeds from the sale of the Offered Certificates will be paid to the Transferor. The Transferor will use such proceeds to repay a portion of the Previously Issued Series and to pay the purchase price of Contracts purchased from the Seller . ." (1998–1 Offering Memorandum at 44.) This statement is also present in the 1998–2 Offering Memorandum.

(1998–2 Offering Memorandum at 43.) Notwithstanding these statements, the plaintiffs still allege the defendants committed fraud by failing to disclose how much they held of the previously issued series and "how much would be paid to the Previously Issued Series or the basis for determining the amounts or who would make these determinations." (Compl.¶ 167.) However, given the disclosure that a use of the proceeds was in fact to repay a portion of the previously issued series, the plaintiffs have failed to allege how the statements made in the Offering Memoranda were actually materially false or misleading. To the extent that the plaintiffs are claiming that it was significant that the defendants held the previously issued series, they fail to allege any facts to show why that was significant or fraudulent.

### G.

■ The plaintiffs allege in broad fashion that the defendants promoted the Certificates as "conservative" investments, when in fact they were known by the defendants to be risky ones. (Compl.¶¶ 171–174.) The plaintiffs simply state, in general and sweeping fashion, "[t]hrough written marketing and promotional materials and orally in conference calls and other conversations, the Defendant Underwriters represented to investors..." (Compl.¶ 173.) There is no indication of which conference calls or promotional materials the plaintiffs are referring to in these allegations. They point to no specific statements describing the investments as "conservative" investments. This type of vague pleading, unaccompanied by any specific details about where, when or by whom any representations about the riskiness or conservative nature of the Certificates were made, falls far short of the requirement imposed by Fed.R.Civ.P. 9(b) that fraud allegations be pleaded with particularity. Consequently,

these allegations cannot be the basis of a properly pleaded securities fraud claim.

Thus, for the reasons explained above, none of the statements identified by the defendants, satisfy the requirements of Rule 9(b) and the PSLRA, and therefore the plaintiffs first cause of action, for securities fraud under § 10(b) and Rule 10b–5, is dismissed. Because this is the first dismissal of the plaintiffs' allegations, and since it cannot be said that the plaintiffs cannot in fact allege a claim, the dismissal is without prejudice.

### III.

■ The defendants move to dismiss the plaintiffs' claims under § 12(a)(2) of the Securities Act arguing that the 1998–1 and 1998–2 Offerings were not securities sold in a public offering. Section 12 of the Securities Act allows buyers of securities to sue the sellers from whom they purchased those securities. Section 12(a)(2) imposes liability on any person who "offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication..." 15 U.S.C. § 77*l*(a)(2). The defendants move to dismiss based on the Supreme Court's decision in *Gustafson v. Alloyd Co. Inc.*, 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), which held that the prospectus referred to in § 12(2) is a document describing a public offering of securities and not a private transaction. *Id.* at 564, 584, 115 S.Ct. 1061. More generally, "liability for untrue statements under Section 12(a)(2) made in either a written prospectus or in oral communications relating thereto is limited to public offerings ..." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 165 F.Supp.2d 615, 622 (S.D.N.Y.2001); *see also Demaria v. Andersen*, 318 F.3d 170, 177 (2d Cir.2003)

("*Gustafson* emphasizes that the 1933 Act was concerned primarily with regulating public offerings.").

The plaintiffs argue that *Gustafson*'s holding is not applicable to the present case because the 1998–1 and 1998–2 Offerings were "public style" private offerings. In addition, they argue that the application of the *Gustafson* holding leads to disparate results, because if the defendants had sold additional Certificates overseas, pursuant to Regulation S, such a sale would be a "public offering" subject to § 12(a)(2) liability, while the sale of the identical securities pursuant to Rule 144A in the United States would not subject the defendants to such liability, even if both sales used the same Offering Memoranda. These arguments, along with the additional distinctions addressed by the plaintiffs, are not supported by any cases cited by the plaintiffs. There is no legal or factual basis for calling the 1998–1 or 1998–2 Offerings "public style private offerings." Moreover, there is no allegation that any of the Certificates were sold in any overseas offering, and there is no disparate treatment of any Certificates in the present case. In any event, the Supreme Court made clear in *Gustafson* that the critical inquiry in determining if § 12(a)(2) liability exists is whether the securities were sold through a public offering or a private transaction. *Gustafson*, 513 U.S. at 571–72, 584, 115 S.Ct. 1061; *see also Emergent Capital*, 165 F.Supp.2d at 622. There is no dispute that both the 1998–1 and 1998–2 securities were sold through private offerings, made pursuant to Rule 144A. Consequently, the defendants cannot be held liable under § 12(a)(2) of the Securities Act, and the plaintiffs' claim under § 12(a)(2) is dismissed.

### IV.

The defendants have also moved to dismiss the plaintiffs' claim for common law fraud and deceit. A claim for common law fraud under New York law must also satisfy the requirements of Fed.R.Civ.P. 9(b). *Lewis v. Rosenfeld*, 138 F.Supp.2d 466, 477–78 (S.D.N.Y.2001). For the reasons explained above, with respect to § 10(b) and Rule 10b–5, the statements identified by the plaintiffs in the Complaint fail to satisfy the requirements of Rule 9(b) that fraud be pleaded with particularity. This failure to satisfy Rule 9(b) also requires that the plaintiffs' claim for common law fraud and deceit be dismissed. *See Rich v. Maidstone Fin., Inc.*, No. 98 Civ. 2569 (DAB), 2002 WL 31867724, at *13 (S.D.N.Y. Dec.20, 2002).

### V.

The defendants also seek to dismiss the plaintiffs' claim of negligent misrepresentation. A claim for negligent misrepresentation must also satisfy the requirements of Rule 9(b) and because the plaintiffs have failed to satisfy Rule 9(b), this claim must also be dismissed. *Simon v. Castello*, 172 F.R.D. 103, 105–06 (S.D.N.Y.1997).

### CONCLUSION

The remaining arguments of the parties are either moot or without merit. For the reasons explained above, the plaintiffs have failed to allege fraud with particularity with respect to all the claims raised in the Complaint, including the claims under the federal securities laws and the New York State common law. Consequently, the defendants' motion to dismiss is granted. Because this is the first dismissal of the plaintiff's complaint, the dismissal is without prejudice. The plaintiff may file an amended complaint within thirty (30) days.

**SO ORDERED.**